ASSOCIATION OF BITUMINOUS
CONTRACTORS, INC.,
Appellant,

v.

Kenneth S. APFEL, Commissioner of the
Social Security Administration, et al.,
Appellees.

No. 97–5132.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 5, 1998.

Decided Sept. 18, 1998.

William H. Howe argued the cause for appellant, with whom Richard A. Steyer and Mary Lou Smith were on the briefs.

Sushma Soni, Attorney, United States Department of Justice, argued the cause for the federal appellee, with whom, Frank W. Hunger, Assistant Attorney General, Mary Lou Leary, United States Attorney at the time the brief was filed, and Douglas N. Letter, Litigation Counsel, were on the brief.

Peter Buscemi argued the cause for appellees United Mine Workers of America, et al., with whom David W. Allen and John R. Mooney were on the brief.

Before: SILBERMAN, TATEL, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellant Association of Bituminous Contractors contends that because its members are not in the "coal industry" as that term is used in the Coal Industry Retiree Health Benefit Act of 1992, the Commissioner of the Social Security Administration may not assign responsibility for coal industry retirees to its member companies. It further claims that "as applied," the Act violates its members' Fifth Amendment due process rights. We affirm the district court's grant of summary judgment in favor of the Commissioner, but on somewhat different grounds than those on which it relied.

## I.

The Association of Bituminous Contractors (Association) is a multi-employer association of contractors that specialize in coal mine construction and related projects.[1] The Association was formed in 1968 for the purpose of negotiating and entering into collective bargaining agreements with the United Mine Workers of America (mine workers union). Its first agreement was known as the "Construction Work Addendum to the National Bituminous Coal Wage Agreement of 1968"; all subsequent agreements have borne the "National Coal Mine Construction Agreement" label (Construction Agreements). The Bituminous Contractors' coal mining producers have their own collective bargaining association, the Bituminous Coal Operators' Association, which has negotiated a separate series of Coal Wage Agreements (National Bituminous Coal Wage Agreements) with the mine workers union.

From the Association's inception until mid–1978, employees and retirees of its member companies were eligible to receive benefits from plans established pursuant to the National Bituminous Coal Wage Agreements, including the Welfare and Retirement Fund of 1950, the 1950 Benefit Plan, and the 1974 Benefit Plan. The Association's members *never* contributed to the 1950 Fund or the 1950 Plan, but pursuant to the 1974 and 1978 Construction Agreements, the Association's members were required to contribute to the 1974 Plan. That obligation ended on May 31, 1978, when the Association agreed to transfer all 1974 Plan beneficiaries whose last employment was with a construction contractor that was a signatory to the 1974 Construction Agreement to the newly established Retired Construction Workers' Benefit Trust (the Construction Trust). Those construction retirees who were eligible to draw benefits from the 1950 Plan (workers who retired before 1976), however, were left behind;[2] those retirees' benefits were funded by signatories to the National Bituminous Coal Wage Agreements—the coal producers—and not the Association's member companies even after 1978.

By the late 1980s, the continuing viability of the 1950 and 1974 Plans was in serious doubt, and this led to labor unrest. The various causes of the health benefit funding crisis which precipitated the Coal Act have been described before, *see, e.g., Carbon Fuel Co. v. USX Corp.,* 100 F.3d 1124, 1127–29 (4th Cir.1996); *Davon, Inc. v. Shalala,* 75 F.3d 1114, 1117–20 (7th Cir.1996); THE SECRETARY OF LABOR'S ADVISORY COMMISSION ON UNITED MINE WORKERS OF AMERICA RETIREE HEALTH BENEFITS, COAL COMMISSION REPORT: A REPORT TO THE SECRETARY OF LABOR AND THE AMERICAN PEOPLE (1990), and we see no need to repeat them here. Suffice it to say that the Congress found it "necessary to modify the current private health care benefit plan structure for retirees in the coal industry to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees." Coal Industry Retiree Health Benefit Act of 1992, Pub.L. No. 102–486, § 19142(a)(2), 106 Stat. 3036, 3037 (1992) (codified at 26 U.S.C. § 9701 note (1994)).

The Coal Act was intended to remedy problems with the provision and funding of health care benefits to retirees in the coal industry. The Act established the Combined Benefit Fund as a new source of benefits for coal industry retiree beneficiaries who were eligible under the 1950 and 1974 Plans, *see* 26 U.S.C. § 9703(f), and a Board of Trustees to administer the Combined Funds, *see* 26 U.S.C. § 9702. It also directed that the 1950 and 1974 Plans be merged into the Combined Fund, *see* 26 U.S.C. § 9702(a)(2), and further required that monies be transferred to the Combined Fund from the 1950 Plan and certain other funds, *see* 26 U.S.C. § 9705; 30 U.S.C. § 1232(h) (1994). The Combined Fund is to be financed on an ongoing basis

---

**1.** The contractors' coal construction work includes subsurface construction of shafts, slopes, and tunnels, surface construction of structures, such as roads, preparation plants, storage silos, office buildings, and bathhouses, and some electrical work. Appellant acknowledges that "[i]t is

that very focus which defines the association" but claims its members sometimes work for non-coal industrial customers as well.

**2.** The Association estimated that there were 130 such eligible 1950 Plan beneficiaries as of 1993.

by annual premium payments from "assigned operator[s]." 26 U.S.C. § 9704(a).

The Act defines "assigned operator[s]" as "the signatory operator[s] to which liability ... is assigned under section 9706." 26 U.S.C. § 9701(c)(5). Section 9706 directs the Commissioner of the Social Security Administration to "assign each [eligible] coal industry retiree ... to a signatory operator which ... remains in business." 26 U.S.C. § 9706(a). It also binds the Commissioner to a particular assignment scheme. Beneficiaries are to be assigned to their most recent employer of at least two years, so long as that employer was a signatory to a 1978 or later "coal wage agreement"; if none, to the most recent 1978 or subsequent agreement signatory employer, without regard to the term of employment; and last, to the pre-1978 signatory operator still in business which employed the retiree for the longest period. 26 U.S.C. § 9706(a)(1)-(3). All assigned operators must be signatory operators, which the statute defines as "person[s] which [are] or [were] signator[ies] to a coal wage agreement." 26 U.S.C. § 9701(c)(1). "Coal wage agreement," in turn, is defined as the National Bituminous Coal Wage Agreement, 26 U.S.C. § 9701(b)(1)(A), or "any other agreement entered into between an employer in the coal industry and the United Mine Workers of America that required or requires ... contributions to the 1950 [ ] Plan or the 1974 [ ] Plan, or any predecessor thereof," 26 U.S.C. § 9701(b)(1)(B)(ii).

In October 1993, the Social Security Administration began assigning coal industry retiree beneficiaries to the Association's members. Soon after, the Combined Fund Trustees sought to collect premium payments from the Association's members on the basis of the Commissioner's assignments. Within a month of the Commissioner's action, the Association brought suit in the district court seeking a declaration that the Act did not apply to its members and, in the alternative, that the Act as applied to its members violated the substantive due process component of the Fifth Amendment to the United States Constitution. The gravamen of appellant's statutory argument, which we describe more completely below, was that the coal contractors were not "employer[s] in the coal industry," as section 9701 of the Coal Act requires, but were rather employers in the *construction* industry. The district court, however, thought it clear that "coal industry" included coal contractors and implied that the Coal Act *required* the Commissioner to assign beneficiaries to the Association's member companies.

Appellant's "as applied" constitutional challenge is premised on its view that its members had made a clean break from the Benefit Plans in 1978, when the Construction Trust, which remains viable today, was established. The Association claims that its members had done all the mine workers union asked it to do by transferring all beneficiaries who practicably could be identified with its member companies from the 1974 Plan to the Construction Trust. To require its members to contribute to the Combined Fund would force them to solve problems that they were not responsible for creating. The district court, however, concluded that, because appellant's member companies participated in and benefitted from the Benefit Plans, for a time without contributing to their funding, they could be made part of the solution to the problem of their underfunding without offending the Constitution. For these reasons, the district court entered summary judgment in favor of the Commissioner and the Combined Fund Trustees.

## II.

The Association renews its statutory and constitutional arguments on appeal. The Association claims that the Coal Act unambiguously excludes coal construction companies from the term "coal industry." And, it claims that even if the statute is ambiguous, the Commissioner's interpretation of the Coal Act is not entitled to deference because Congress has not delegated him policymaking authority and because his interpretation was not clearly set forth prior to this litigation. The Association also contends that the Commissioner's interpretation is not reasonable, and that the Commissioner arbitrarily and capriciously relied on lists provided by the Combined Fund Trustees in making his assignments.

We begin with appellant's primary claim, that its members cannot be "assigned operators" by the Coal Act's own terms. The argument flows as follows: Section 9701(c)(5) provides that assigned operators must be signatory operators, which section 9701(c)(1) defines as current or former signatories to a coal wage agreement. Section 9701(b)(1)(A) identifies the National Bituminous Coal Wage Agreement as a "coal wage agreement," but neither the Association nor its members are parties to that Agreement, see § 9701(b)(3) (defining the National Bituminous Coal Wage Agreement as a collective bargaining agreement negotiated by the coal operators association and the mine workers union), a claim appellees do not dispute. To be sure, section 9701(b)(1)(B) provides that "any *other* agreement entered into between an *employer in the coal industry* and the United Mine Workers of America that required or requires ... the provision of health benefits to retirees of such employer ... or contributions to the 1950 [ ] Plan or the 1974 [ ] Plan, or any predecessor thereof" may also be a "coal wage agreement." But because the Association's members are employers in the *construction* industry, not the coal industry, the Association contends that it escapes section 9701(b)(1)(B)'s coverage as well. (Appellant does not dispute that its members were required to make contributions to the 1974 Plan by the 1974 Construction Agreement, and for a few additional months by the 1978 Construction Agreement.)

The Association's argument, in essence, turns on the proper construction of the phrase "employer in the coal industry." Appellant attributes great significance to the omission of any reference to coal construction, the Association, or the Construction Agreements from the text of the Act. Congressional silence, appellant argues, is pregnant. Had Congress wanted to create payment liability for construction companies under the Act, it explicitly would have said so. The Association contends that the "coal industry" language has a "restrictive" meaning designed only to ensure that the Coal Act extended to all coal *production* employers. (Congress, it is claimed, was aware that some coal production companies had

entered into specialized agreements with the mine workers union and therefore were not signatories to the National Bituminous Coal Wage Agreement.) The Association buttresses its textual argument with the legislative history of the Coal Act, which the Association maintains provides clear evidence that Congress never contemplated including coal construction companies within the Coal Act's reach. And, the Association maintains that Congress could not possibly have thought the Association's members to be a cause of the underfunding problem, and accordingly could not have intended to make its members part of the solution, because at least ten years before legislation was even proposed, the Association's members had established the Construction Trust, through which they claim to have taken on *all* of the liabilities that they were then asked to assume from the National Bituminous Coal Wage Agreements. Appellees, on the other hand, argue from the same statutory text, legislative history, and legislative purpose that Congress intended the term "coal industry" to include coal construction companies such as the Association's members.

In determining whether appellant's or the Commissioner's interpretation of the statutory provision should control, we apply the familiar two-step analysis of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We ask first whether the statute has a clear meaning, and begin that inquiry with the text. Unfortunately for appellant, the Coal Act never defines the phrase "employer in the coal industry." The Association's claim that the omission of any reference to construction or related terms makes it *clear* that Congress did not consider its members to be part of the coal industry is rather far-fetched. Granted, Congress in its "Findings and Declaration of Policy" referred only to companies that produce, transport, or use coal and made no mention of coal construction companies. *See* 26 U.S.C. § 9701. But since the congressional finding in no way purports to define "coal industry," we do not see how it, standing alone, can supply a clear meaning of the term. Similarly, the notion that "coal industry" should be

read to exclude coal construction companies because Congress' stated policy was to save the benefit fund agreements to which the Association's members were not signatories is a complete non-starter. That coal construction companies were not signatories to the agreements creating the jeopardized funds does not mean that Congress could not have intended to make them part of the solution (especially when those companies were required to contribute to those funds pursuant to separate agreements). Nor does appellant direct us to anything in the legislative history that supports its explanation for why Congress used the term "coal industry."

We do not think that appellees, for their part, have been able to show that the term "coal industry" clearly *includes* coal construction companies either. Many of the Trustee–appellee's and the federal appellee's arguments are nothing but mirror images of appellant's arguments. Both sides labor ineffectually to place a clear meaning on statutory silence. Nor do appellees advance their case by asserting that coal construction *must* be included within "coal industry" because construction is an indispensable part of the mining and production of coal. After all, as appellant rightly points out, under that logic construction companies would be a part of every industry for which they construct. The district court thought to resolve the statutory construction issue on the basis of a description of the Association in the Keystone Manual. But it is Congress' intent, not the Keystone Manual's, with which we are concerned. And although the district court may well be right that it is "disingenuous" for the Association to argue that its members are not part of the coal industry in light of its apparent self-description to that effect in the minutes of a committee meeting, we are aware of no doctrine of statutory interpretation estoppel that would preclude the Association from arguing differently before this court. Again, the relevant question is Congress' intent, not the Association's pattern of consistency in self-description.

We think the only thing "clear" about the term "coal industry" is that the term is ambiguous with respect to coal construction companies. And when a statute that does not have a clear meaning is entrusted to agency administration, we defer to the agency's interpretation of that statute, if reasonable, under the second step of our *Chevron* analysis. *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. The Association would have us refuse to defer because it contends that Congress did not delegate to the Commissioner the authority to interpret the term "coal industry." That term is used (although not defined) in Subchapter A of the Coal Act ("Definitions of General Applicability"), and Congress, it is asserted, did not delegate to the Commissioner any authority over that Subchapter. But, as appellant concedes, the Commissioner is explicitly charged with assigning eligible beneficiaries to signatory operators by section 9706 of Subchapter B. Implicit in that direction is a delegation to the Commissioner to determine who are the signatory operators, and the Commissioner must interpret the statute—including definitions of general applicability—to perform that task. *See Chevron,* 467 U.S. at 843–44, 104 S.Ct. 2778 (noting that deference is appropriate as to both express and implied delegations); *Kansas City v. Department of Housing & Urban Dev.,* 923 F.2d 188, 191–92 (D.C.Cir.1991) (same). After all, the definitions in question are definitions of "general applicability" that explicitly extend to the entire chapter—not, as appellant implies, to Subchapter A alone.[3]

The Association also claims that the Commissioner's interpretation is not entitled to deference because it was not promulgated in a rule issued pursuant to notice and comment, and because the Administration's internal guidelines do not consistently define the term to reach coal contractors. But an agency need not promulgate a legislative rule setting forth its interpretation of a statutory term for that interpretation to be entitled to

---

3. Appellant cites our decision in *Department of Treasury v. FLRA,* 837 F.2d 1163 (D.C.Cir.1988), as authority for its assertion that an agency's interpretation is not entitled to deference if it is an interpretation of a "statutory provision not within the agency's enabling statute." We do not think that Subchapter A can be viewed as such a discrete statute, especially since Subchapter A explicitly references the entire Act.

deference—the Supreme Court has said that it is appropriate to defer to an agency's interpretation so long as it represents the agency's "fair and considered judgment on the matter." *Auer v. Robbins*, 519 U.S. 452, 117 S.Ct. 905, 912, 137 L.Ed.2d 79 (1997). As for the internal guidelines, we think it plain that they were not agency utterances "that can be thought of as an authoritative departmental position." *Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 587 (D.C.Cir.1997) (quoting *Auer*), *cert. denied sub nom. Pollin v. Paralyzed Veterans of Am.*, —— U.S. ——, 118 S.Ct. 1184, 140 L.Ed.2d 315 (1998); *cf. Appalachian Regional Healthcare v. Shalala*, 131 F.3d 1050, 1053 n. 4 (D.C.Cir.1997) (a statement by counsel in the course of an internal quasi-adjudicatory proceeding was not a "fair and considered judgment"). The truth of the matter is that the Commissioner had not, prior to this litigation, carefully explained why he believes that coal contractors may be assigned responsibility under the statute. Yet the Commissioner has consistently made assignments to coal construction companies under the Coal Act, and in doing so must have interpreted the Coal Act to allow that. This litigation offers the Commissioner his first opportunity to explain his decision. We defer to counsel's explanation because it represents the agency's "fair and considered judgment." *Auer*, 117 S.Ct. at 912; *see also Tax Analysts v. IRS*, 117 F.3d 607, 613 (D.C.Cir.1997) (deferring to appellate counsel's explanation when letters of the IRS's Assistant Chief Counsel denying the appellant's FOIA administrative appeals were conclusory); *Church of Scientology v. IRS*, 792 F.2d 153, 164–67 (D.C.Cir.1986) (en banc) (Silberman, J., concurring). Nor is counsel's explanation the kind of *post-hoc* rationalization to which we do not defer. *See, e.g., City of Kansas City, Mo. v. HUD*, 923 F.2d 188, 192 (D.C.Cir.1991). The explanation offered

by counsel would seem to be the same rationale the Commissioner implicitly adopted when making prior assignments to coal construction companies. It is not offered as an alternative or supplemental explanation for an agency action, such as an adjudication, previously justified on other grounds. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

Appellant understandably makes many of the same arguments it advanced in contending that the statute had a clear meaning in arguing that the Commissioner's interpretation is unreasonable. But we are not persuaded. The Administration's counsel explains that the Commissioner interpreted "coal industry" to cover coal contractors because the Association's members specialize in coal mine construction, which "directly makes coal mining possible," and because some construction retirees were left in the 1950 Plan after the Construction Trust was established. These notions seem consistent with the statutory structure. Moreover, as the Trustees' counsel points out, the Association does not bargain with labor groups other than the mine workers union. In addition, we note that the statutorily mandated assignment preference scheme set forth in section 9706(a) ensures that the construction contractors are assigned only those retirees whom they actually employed. If an assignee disputes the Commissioner's determination, an administrative review process is available by statute and provided for in the Commissioner's regulations. *See* 26 U.S.C. § 9706(f); 20 C.F.R. § 422.605 (1998). We think that procedure further underscores the reasonableness of the Commissioner's inclusion of coal construction companies within the "coal industry" in that it protects the Association's members against erroneous assignment of liability for retirees whom they never employed.[4]

---

4. Appellant's final attack on the reasonableness of the Commissioner's assignments to its members is that he arbitrarily relied upon lists provided by the Trustees, without critical examination of whether a company on that list was actually in the "coal industry." That claim is contradicted by the record. A declaration by the Deputy Associate Commissioner for Retirement and Survivors Insurance, Supplemental Security Income

Programs, states that the Commissioner used the Trustees' lists, but also used "other information available to SSA including: employer wage reports; coal industry sources ...; the Keystone Coal Industry Manual; coal company filings in court; and statements at a Congressional Hearing on the Coal Act." That declaration also asserts that the Social Security Administration "searched its employment records back to 1946,"

## III.

We turn to appellant's "as applied" constitutional challenge. Appellant argued in its initial brief that the imposition of retroactive liability on its members under the Coal Act violates their Fifth Amendment substantive due process rights because they have assumed all the liabilities from the benefit plans that they were asked to assume in 1978, and because they continue to provide the health care benefits of the agreed-upon beneficiaries through the Construction Trust without event. The Supreme Court last Term considered whether the application of the contribution provision of the Coal Act to a company that had sold its coal producing business in 1965 violated the Due Process and Takings Clauses of the Constitution. *See Eastern Enters. v. Apfel,* —— U.S. ——, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). Four Justices (O'Connor, joined by Chief Justice Rehnquist, and Justices Scalia and Thomas) thought that the Coal Act as applied to Eastern Enterprises effected an unconstitutional taking, but expressly declined to decide Eastern's due process claim. *See id.* at 2137–53. Justice Kennedy's concurrence in the judgment provided the fifth vote to hold the Coal Act unconstitutional, but he thought that the Act violated due process, and dissented from the plurality's takings analysis. *See id.* at 2154–60 (Kennedy, J., concurring in the judgment and dissenting in part) (reasoning that general imposition of liability unrelated to a specific interest in property cannot constitute a taking). The four remaining dissenting Justices (Breyer, joined by Stevens, Souter, and Ginsburg) agreed with Justice Kennedy's rejection of the plurality's takings analysis, but concluded that the Coal Act as applied to Eastern Enterprises satisfied substantive due process. *See id.* at 2161–68 (Breyer, J., dissenting). At the parties' request, we ordered supplemental briefing on the Association's substantive due process challenge in light of the *Eastern Enterprises* decision.

Appellant argues in its supplemental brief that *Eastern Enterprises* "compels" the conclusion that the Coal Act is unconstitutional as applied to its member companies. It contends that *Eastern Enterprises* stands for the broad proposition that the Coal Act is unconstitutional in situations where it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience. Its members, we are told, are in precisely such a situation; it points to the severity of the Coal Act's economic impact on its members relative to the extent of their participation in the benefit plans, the alleged impossibility that its members might have expected the kind of liability that the Coal Act eventually imposed, and the retroactive (and thus fundamentally unfair) nature of the governmental action involved.

We begin our analysis with a bedrock principle of constitutional adjudication— a principle which appellant either does not accept or is attempting to obscure. The Constitution prohibits certain governmental action through specific clauses—clauses that, with Supreme Court interpretation, have given rise to various and sometimes rather complex doctrines of constitutional law. Courts do not adjudicate generalized claims of unconstitutionality, but rather resolve constitutional questions by applying these settled doctrines to specific constitutional claims asserted under specific constitutional clauses. Appellant's supplemental brief ignores this notion and asserts that, because the Coal Act was held "unconstitutional" in *Eastern Enterprises,* it must be "unconstitutional" here too. Seemingly abandoning its prior due process challenge to the statute, appellant puts forth an unidentified constitutional claim of right, supported by an analysis that, so far

extracted earning reports "from microfilm and electronic records," and "checked its records of employers who had filed Form W–2 wage reports for the past two years." The Association presents no evidence to back its claim that the Commissioner blindly and inappropriately relied upon the Trustees' lists. Be that as it may, the Coal Act seems to contemplate a cooperative assignment process, directing that the Trustees "shall fully and promptly cooperate with the Commissioner in furnishing, or assisting the Commissioner to obtain, any information the Commissioner needs to carry out the Commissioner's responsibilities...." 26 U.S.C. § 9706(d)(3) (1994).

as we can tell, tracks the three-factor "test" ordinarily used to evaluate challenges under the Takings Clause of the Fifth Amendment. *See Eastern Enter.,* ── U.S. at ──, ──── ────, 118 S.Ct. at 2148, 2149–53 (analyzing the Coal Act pursuant to the three factors— economic impact, interference with investment-backed expectations, and the character of the governmental action—set forth in *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986)). But the Association has never asserted a claim under the Takings Clause in this litigation, either in the district court or on appeal. Even if appellant had attempted, in light of *Eastern Enterprises,* to switch strategies and specifically to assert for the first time in its supplemental brief that the Coal Act's assignment provision constitutes an unconstitutional taking of its members' property, we would in all likelihood have deemed the claim waived and declined to address it. *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976).[5] We certainly will not apply a takings analysis to resolve a due process challenge or engage in a free-wheeling, non-textual examination of the "constitutionality" of the Coal Act.

Nevertheless, we are still obliged to determine just how the decision in *Eastern Enterprises* affects the one and only constitutional question properly before this court: namely, whether the Coal Act as applied to the Association's members violates the Due Process Clause. But far from controlling the due process challenge in this case, as appellant contends, the plurality opinion in *Eastern*

*Enterprises* expressly declined to rule on the petitioner's due process challenge, reasoning that resolution of the takings question made such a ruling unnecessary. *See Eastern Enters.,* ── U.S. at ──, 118 S.Ct. at 2153. And although the plurality noted that "analysis of legislation under the Takings and Due Process Clauses is correlated to some extent," *id.* (citing *Connolly,* 475 U.S. at 223), a correlation is not an equivalency. The plurality's conclusion that the Coal Act effected an unconstitutional taking therefore does not answer the question whether the Act, as applied in analogous circumstances, also violates the Due Process Clause.

We also agree with the government that Justice Kennedy's concurrence in the judgment is of no help in appellant's efforts to cobble together a due process holding from *Eastern Enterprises'* fragmented parts. We have previously held that the rule of *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), under which the opinion of the Justices concurring in the judgment on the "narrowest grounds" is to be regarded as the Court's holding, does not apply unless the narrowest opinion represents a "common denominator of the Court's reasoning" and "embod[ies] a position implicitly approved by at least five Justices who support the judgment." *King v. Palmer,* 950 F.2d 771, 781 (D.C.Cir.1991). Justice Kennedy's due process analysis clearly does not meet this standard because he alone was willing to invalidate economic legislation on the ground that it violated the Due Process Clause. And, as should be obvious, Justice

---

5. Nor would appellant have been able to come within the supervening-change-in-law exception to our ordinary waiver principle. *See, e.g., Roosevelt v. E.I. Du Pont de Nemours,* 958 F.2d 416, 419 (D.C.Cir.1992). The *Eastern Enterprises* plurality applied settled takings principles to the petitioner's challenge, and did not purport to alter the state of the law in any way. The only conceivable change in takings jurisprudence brought about by *Eastern Enterprises* is that the five dissenting justices (Justice Kennedy dissented from the takings portion of the plurality opinion) apparently believe that the imposition of liability alone is not a taking of property under the Fifth Amendment. *See Eastern Enters.,* ── U.S. at ──── ────, 118 S.Ct. at 2154–58 (Kennedy, J., concurring in the judgment and dissenting in part); *id.* at 2161–63 (Breyer, J., dissenting).

But even if this development constitutes a "change" in the law (which we doubt given that dissenting votes have no precedential authority), it would not be a change that could possibly explain appellant's failure to raise a takings claim below. After all, *Eastern Enterprises* at most renders takings claims *less* attractive to litigants than they once were because of the possibility that the five dissenters on the takings issue could form a majority in a later case. In addition, so obvious was the applicability of the Takings Clause to appellant's case prior to *Eastern Enterprises* that the three other plaintiffs with whom the appellant's case was consolidated below each asserted a takings claim; appellant alone rested its constitutional case exclusively on the Due Process Clause.

Kennedy's due process reasoning can in no sense be thought a logical subset of the plurality's takings analysis. In short, the government is correct in stating that the only binding aspect of *Eastern Enterprises* is its specific result—holding the Coal Act unconstitutional as applied to Eastern Enterprises.

 Thus, our basic inquiry in resolving appellant's due process challenge remains the same after *Eastern Enterprises* as it was before: [6] namely, we accord economic legislation a "presumption of constitutionality" that can be overcome only if the challenger establishes that the legislature acted in an arbitrary and irrational way. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). The challenged legislation, moreover, is to be upheld if there is any conceivable rational basis supporting it, whether or not the Congress had that particular basis in mind when the legislation was enacted. *See FCC v. Beach Communications*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Even legislation with a retroactive effect may satisfy due process if the "retroactive application of the legislation is itself justified by a rational legislative purpose." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729–30, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984). We think that the Coal Act, as applied to the Association's members, passes this test for many of the same reasons that our sister circuits have articulated in upholding the Coal Act against "as applied" due process challenges raised by various other "coal industry" members. *See, e.g., Eastern Enters. v. Chater*, 110 F.3d 150 (1st Cir.1997), *rev'd on other grounds*, —— U.S. ——, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998); *Holland v. Keenan Trucking Co.*, 102 F.3d 736 (4th Cir.1996); *Lindsey Coal Mining Co. v. Chater*, 90 F.3d 688 (3d Cir.1996); *In re Blue Diamond Coal Co.*, 79 F.3d 516 (6th Cir.1996); *Davon, Inc. v. Shalala*, 75 F.3d 1114 (7th Cir.1996); *In re Chateaugay Corp.*, 53 F.3d 478 (2d Cir.1995). Congress enacted the Coal Act to remedy the health care benefit funding crisis with respect to coal industry retirees, a step it

thought necessary given its finding that coal production was important to the national economic interest and that the collapse of the retirement benefit system could jeopardize the stability of interstate commerce. Especially in light of the labor unrest that predated the legislation's enactment, we do not doubt that the Congress had a legitimate purpose in passing the Coal Act.

 Nor do we think that the Congress employed an irrational means to achieve its purpose. It sought to have those responsible for plan liabilities contribute to ensuring that health benefits would be provided to retirees. Appellant does not dispute that some construction retirees were not transferred to the Construction Trust in 1978; it argues only that it is significant that its members are providing health benefits for all agreed-upon (the vast majority of their) retirees through the Construction Trust. Appellant explains that to the extent that it left liabilities in the 1974 Plan, it was because a different method of identifying beneficiaries—last employer prior to retirement, not the Coal Act's statutory preference scheme—was used in 1978 to move retirees from the 1974 Plan to the Construction Trust. Whatever the reason, the truth is that there are coal construction retirees who are Combined Fund beneficiaries, and it is rational for Congress to expect the Association's members to help fund their retirement benefits in light of the declared purpose to "identify persons most responsible for plan liabilities." The Association, as it must, concedes that construction retirees benefitted from the 1950 Plan, and the 1950 Fund before it, without *any* contribution from its members. Appellant explains that its members never assumed an obligation to contribute to the 1950 Plan and were never asked to remove beneficiaries from the 1950 Plan when the Construction Trust was established. But it is surely rational for the Congress to expect that the member companies' failure to contribute while their retirees received benefits contributed to the underfunding crisis that the Plans faced in the late 1980s. Although the coal contractors may

---

**6.** That is not to say that *Eastern Enterprises* is irrelevant to this case. We discuss its relevance below.

not have been the dominant cause of that underfunding, legislation need not burden the most responsible party to survive rational basis review. *See Holland,* 102 F.3d at 742.[7]

Even though *Eastern Enterprises* does not control the result in this case, it is surely relevant to our analysis that both the plurality opinion and Justice Kennedy's concurrence focused on the lack of proportionality between the Coal Act's imposition of retroactive liability and the amount of Eastern's participation in prior coal benefit agreements.[8] Because Eastern left the coal industry in 1965, the plurality and Justice Kennedy concluded that the company could not have been expected to anticipate the obligation to fund lifetime retiree benefits that the Coal Act eventually imposed. In their view, an industry commitment to provide lifetime benefits was not evident until the 1974 and 1978 agreements—agreements which Eastern did not participate in negotiating and which created benefit funds to which Eastern was not required to contribute.

If the Association's members were in substantially similar factual circumstances to Eastern, we would be compelled to resolve the difficult question, left open by the *Eastern Enterprises* plurality, whether the quality and quantity of retroactive liability identified in *Eastern Enterprises* also violates the Due Process Clause. The Association's members, however, are not in substantially similar factual circumstances to Eastern.

7. Nor do we find it significant, for due process purposes, that the legislative history does not mention the Association's participation in the benefit plans or the creation of the Construction Trust as a cause of the financial difficulties of the 1950 and 1974 Plans. After all, the government can create a rational explanation *ex post* to support a statute attacked on due process grounds. That being so, we can hardly require a showing that Congress specifically identified the Association's members as a cause of the problem before it passed the Coal Act in order to sustain the Act under rational basis review.

8. It is true that the plurality focused on the lack of proportionality as part of its takings analysis. But the prior cases on which the plurality relied for its takings analysis also suggest that the Due Process Clause imposes some minimal requirement of proportionality between an employer's actual conduct and its ultimate liability under a multi-employer benefit plan. *See Concrete Pipe*

The crucial fact upon which the *Eastern Enterprises* plurality and Justice Kennedy relied in concluding that Eastern's Coal Act liability was disproportionate to its past conduct and thus unfairly retroactive—namely, Eastern's departure from the coal industry in 1965—is absent in this case. *See Eastern Enters.,* —— U.S. at ——, 118 S.Ct. at 2151.[9] The Association's members are still active members of the "coal industry" (under the Commissioner's reasonable interpretation of that term). More to the point, the 1974 and 1978 Construction Agreements incorporated by reference the National Bituminous Coal Wage Agreements of the same years. The plurality in *Eastern Enterprises* indicated that the latter agreements, which greatly expanded benefit provisions and contained provisions designed to maintain the level of contributions during the life of the agreement (the "guarantee" clause) and to secure contributions from employers who remain in the industry but fail to sign a subsequent agreement (the "evergreen" clause), created an expectation of lifetime benefits that the employers who participated in those agreements were responsible for creating. *See Eastern Enters.,* —— U.S. at ——, 118 S.Ct. at 2150; *id.* at 2159 (Kennedy, J., concurring in the judgment and dissenting in part). And as appellees point out, the 1974 agreement contained a provision expressly providing that pensioners and their dependents would receive a health benefit card "until death" or "for life."

& *Prods. of Calif., Inc. v. Construction Laborers Pension Trust,* 508 U.S. 602, 637–39, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *R.A. Gray,* 467 U.S. at 733, 104 S.Ct. 2709. And although the plurality did not reach the question whether the identified lack of proportionality violated due process, that was precisely the ground upon which Justice Kennedy rested his concurrence in the judgment.

9. We agree with appellant, however, that, in light of the *Eastern Enterprises* decision, and contrary to the district court's conclusion below, there can be no question that the Association's members' Coal Act liability is in fact retroactive given that the Act attaches new legal consequences to an employment relationship completed before its enactment. *See Eastern Enters.,* —— U.S. at ——, 118 S.Ct. at 2151 (citing *Landgraf v. USI Film Prods.,* 511 U.S. 244, 270, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)).

The clear implication of each opinion in *Eastern Enterprises* is that employer participation in the 1974 and 1978 agreements represents a sufficient amount of past conduct to justify the retroactive imposition of Coal Act liability (for the dissenting justices, of course, such participation is not even necessary). Justice Kennedy's additional concern that liability imposed on past employment relationships be "remedial" is also satisfied in this case because the Association's members, unlike Eastern, withdrew from their prior commitment to contribute to the funds at precisely the point in time (1978) at which the benefit obligation dramatically expanded, and therefore "contributed to the perilous financial condition of the 1950 and 1974 plans which put the benefits in jeopardy," *Eastern Enters.*, —— U.S. at ——, 118 S.Ct. at 2159 (Kennedy, J., concurring in the judgment and dissenting in part). Finally, in evaluating the proportionality between the Association's members' past conduct and their liability for 1950 Plan beneficiaries under the Coal Act (the only liability at issue in this case), we note again that the Association's members never contributed to the 1950 Plan even though some of its employees were beneficiaries of that plan. There can be little doubt that receiving free benefits from a fund (even when a contribution to that fund is not technically required), together with the other conduct we have described, establishes the minimal link between conduct and liability that the Due Process Clause requires in order to sustain retroactive liability.

*Amici Curiae* LTV Corporation and Nacco Industries urge us to resist this conclusion, contending that participation in the 1974 and 1978 agreements—contrary to the clear implication of each opinion in *Eastern Enterprises*—is not sufficient to render retroactive liability permissible. *Amici* argue that a company that participated in the 1974 and 1978 agreements is indistinguishable from Eastern in that these agreements, like the pre–1965 agreements signed by Eastern, do not explicitly set forth a promise to provide lifetime benefits. The provision guaranteeing a benefit card for life is, in *amici*'s view, simply a guarantee of portable benefits that

a miner could take from employer to employer; the provision represents no independent guarantee of specific health benefits, and is qualified by the provisions in the agreement specifying that the signatory's obligation to fund benefits lasts only for the term of the agreement. Because neither the 1974 nor the 1978 agreement explicitly obligated signatories to fund benefits for life, *amici* conclude, employers who participated in those agreements could not be expected to anticipate the Coal Act's obligation to fund lifetime benefits any more than could Eastern, which departed from the industry in 1965.

*Amici*'s argument is subtle, but ultimately unpersuasive. To begin with, *amici* are wrong when they insist that, if we conclude that the Association's members are situated exactly as was Eastern Enterprises, we must find a due process violation. For the reasons outlined above, we think that such a reading of *Eastern Enterprises* is untenable. *Amici*'s argument also implies that any act of Congress that imposes a liability inconsistent with obligations for which employers specifically contracted is per se disproportionate and thus violates the Due Process Clause. But it is settled law, undisturbed by *Eastern Enterprises*, that "[c]ontracts, however express, cannot fetter the constitutional authority of Congress" and that "[p]arties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." *Connolly*, 475 U.S. at 223–24, 106 S.Ct. 1018 (quoting *Norman v. Baltimore & Ohio R. Co.*, 294 U.S. 240, 307–08, 55 S.Ct. 407, 79 L.Ed. 885 (1935)). If it were clear, as *amici* contend, that any participation less than an explicit and contractually binding promise to fund lifetime benefits would render Coal Act liability in violation of the Due Process Clause, the plurality and Justice Kennedy certainly would not have pointed to the 1974 and 1978 agreements as important events. Significantly, the plurality viewed the 1974 and 1978 agreements as critical to its analysis even while explicitly acknowledging that those agreements only required employers to fund benefits for the life of the respective agreements. *See East-*

**1258**

*ern Enters.,* — U.S. at —, 118 S.Ct. at 2140; *id.* at 2152.[10] The constitutionally significant feature about these later agreements is that they made it reasonable for participating employers to expect a similar state-imposed duty, and thus rendered such a duty, when eventually imposed, not unfairly retroactive. That appellants could have successfully defended a breach of contract suit seeking lifetime benefits under the 1974 agreement is of no consequence.

In rejecting appellant's constitutional challenge, we take seriously the *Eastern Enterprises* plurality's cautionary words about employing the Due Process Clause to invalidate economic legislation, *see Eastern Enters.,* — U.S. at —, 118 S.Ct. at 2153, and Justice Kennedy's concession (despite his vote to hold the Coal Act unconstitutional on due process grounds) that "[s]tatutes may be invalidated on due process grounds only under the most egregious of circumstances," *id.* at 2159 (Kennedy, J., concurring in the judgment and dissenting in part). For the reasons outlined above, we think this case does not measure up to "one of the rare circumstances in which even such a permissive standard has been violated." *Id.* Nor do we think that a remand is appropriate to permit appellant to expand the record for purposes of demonstrating the harsh economic effect that the Coal Act allegedly works on its members. Nothing in *Eastern Enterprises* altered the basic method of economic due process analysis. Rationality is, as it has always been, the touchstone. Appellant has failed to persuade us that the Coal Act's ends and means, as applied to its members, are so arbitrary and irrational as to warrant invalidation under the Due Process Clause.

10. It is true that the plurality rejected the dissent's conclusion that the participation of the federal government in prior coal agreements, together with statements from industry members and members of Congress, demonstrated an implicit industry-wide promise to fund lifetime benefits. *See Eastern Enters.,* — U.S. at —, 118 S.Ct. at 2152. And it was Justice Stevens in dissent who relied upon the First Circuit's conclusion that, "[f]or purposes of due process review, Congress' determination that a commitment was made need not rest upon a legally

* * * *

For the foregoing reasons, the judgment of the district court is

*Affirmed.*

enforceable promise; it is enough that Congress' conclusions as to the existence and effects of such a commitment are rational." *Id.* at 2160 n. 4 (Stevens, J., dissenting) (quoting *Eastern Enters.,* 110 F.3d 150, 157 (1st Cir.1997)); *see also id.* at 2165 (Breyer, J., dissenting). However, we think that the plurality and the dissenters were in agreement that reasonable expectations can be formed even in the absence of a binding contractual promise, and disagreed only on the question whether Eastern's participation prior to 1965 was sufficient to make reasonable the expectation of liability under the Coal Act.