COMBINED
PROPERTIES/GREENBRIAR
LIMITED PARTNERSHIP, Plaintiff,

v.

Dean E. MORROW, et al., Defendants.

Dean E. Morrow, et al., Third–
Party Plaintiffs,

v.

Aquiport Mid–Atlantic Retail, Inc., et al., Third–Party Defendants.

J. Edward Glover and Puritan Systems, Inc./Progressive Cleaners, Third–
Party Plaintiffs,

v.

Fairfax County, Virginia, Third-party Defendant.

Civil Action No. 98–1584–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 30, 1999.

Robert E. Pokusa, Paul, Hastings, Janofsky & Walker, Washington, DC, for Combined Properties.

Kevin B. Bedell, Collier, Shannon, Rill & Scott, PLLC, Washington, DC, for Marilyn R. Morrow, Morrow Corporation.

William L. Stauffer, McLean, VA, for Greenbrier–50 LP.

Benjamin G. Chew, Washington, DC, for Puritan Systems, Inc./Progressive Cleaners.

*MEMORANDUM OPINION*

BRINKEMA, District Judge.

Before the Court is third-party defendants/third-party plaintiffs J. Edward Glover's and Puritan Systems, Inc./Progressive Cleaners' Motion for Summary Judgment. Because we find that the issues are ready for decision and oral argument would not further the decisional process, we will decide this motion on the pleadings.

## BACKGROUND

Plaintiff, Combined Properties/Greenbriar Limited Partnership (Greenbriar LP) originally brought this CERCLA action against defendants, Dean E. Morrow, Marilyn R. Morrow, and the Morrow Corporation (collectively, Morrow). Morrow then brought a third-party complaint against several other parties, including J. Edward Glover and Puritan Systems, Inc./Progressive Cleaners (Glover and Puritan Systems are referred to collectively as Puritan).

Greenbriar LP is the owner of Greenbriar Town Center, a shopping center in Fairfax, VA. In this action, Greenbriar LP seeks injunctive relief and damages for the costs of remedying the contamination by hazardous materials allegedly resulting from waste disposal in the operation of a dry cleaning business (the Business) located at Store No. 8 (the Property) at Greenbriar Town Center. From 1969 until 1992, three different entities ran dry cleaning business at the Property. These were Puritan,[1] from 1969–1974; Greenbriar Cleaners from 1974–1986; and Morrow, from 1986–1992. Greenbriar LP alleges that these owners all operated a "plant on premises" dry cleaning business within the shopping center in which they used certain chemicals, including perchloroethylene (PCE), a toxic and hazardous substance. Greenbriar LP further alleges that the owners permitted the PCE to contaminate the soil and groundwater and that Greenbriar LP has borne and will continue to bear the costs of investigating and characterizing the type and extent of the contamination, as well as of remediation. It is estimated that the total cost of cleanup will be approximately $ 1 million. Greenbriar LP brings this action under section 7002 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C.A. § 6972(a)(1)(B) (1995), and under sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C.A. §§ 9607(a)(2) and 9613(f) (1995), as well as under common law causes of action.

Puritan's summary judgment motion raises a pure question of law and, for the purposes of this motion only, Puritan has agreed to assume certain facts as true. Specifically, Puritan, which ran the Business under the name Progressive, assumes that it satisfies the requirements for CERCLA liability, in that it used PCE in its business and disposed of some forms of waste containing at least small amounts of PCE, while it was in business. The parties agree that Puritan sold the Business in 1974, six years before CERCLA's effective date, and that Puritan's waste disposal practices were legal at the time.

The single question of law raised in Puritan's motion is whether the Supreme Court's recent decision in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), requires a finding that CERCLA cannot be retroactively applied to Puritan. The parties agree that before *Eastern Enterprises*, the law was clear in all circuits that the retroactive liability imposed by CERCLA was constitutional. *See, e.g., United States v. Monsanto*, 858 F.2d 160 (4th Cir.1988). Puritan argues that courts must now reconsider this view of retroactivity in light of *Eastern Enterprises*. Plaintiffs and third-party plaintiffs disagree, arguing that *Eastern Enterprises* is limited to its facts and that *Monsanto* has never been overruled or superseded.

## DISCUSSION

### I. The Law Regarding Retroactive Liability Under CERCLA

#### A. Fourth Circuit Law Before Eastern Enterprises

The Fourth Circuit first addressed the retroactivity of CERCLA in *United States v. Monsanto*, 858 F.2d 160 (4th Cir.1988). In that case, between 1976 and 1980, a South Carolina waste-handling business had been disposing toxic waste on a four-acre site it had leased for that purpose. The business disposal was done in a very

---

**1.** Glover is the majority shareholder of Puritan.

haphazard manner, allowing toxic chemicals to leak from "rusted, rotted, and otherwise deteriorated" drums, permitting incompatible chemicals to commingle, and creating "noxious fumes, fires, and explosions." *Id.* at 164. The United States filed suit against the business under RCRA. The government later amended its complaint to include a CERCLA count after that statute became effective.

In *Monsanto*, the Fourth Circuit determined that CERCLA is a retroactive liability statute, in that it creates joint and several liability for all parties "that played a role in creating the hazardous conditions," even if they played that role before CERCLA became effective. *Id.* at 174. The Fourth Circuit explicitly found that the system Congress created in CERCLA is a logical one, given the often indivisible nature of conditions creating an environmental hazard. Therefore, there was no violation of due process in imposing liability against the waste-handling business, even though the methods by which it disposed of the toxic materials were technically legal at the time. *See id.* ("[R]etroactive application of CERCLA does not violate due process"; finding that the consequences of this rule are not " 'particularly harsh and oppressive' ") (citation omitted). The Fourth Circuit noted that all other courts to have examined this issue had reached the same conclusion, i.e., that retroactive liability under CERCLA satisfies constitutional scrutiny. *See id.* at 174 (stating that other courts had "held uniformly that retroactive operation [of CERCLA] survives the Supreme Court's tests for due process validity"). Four years later, the Fourth Circuit further explained the nature of CERCLA liability, holding that "[t]he trigger to liability under [42 U.S.C.] § 9607(a)(2) is ownership or operation of a facility at the time of disposal, not culpability or responsibility for the contamination." *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 846 (4th Cir.1992).

## B. Eastern Enterprises

In 1998, the Supreme Court addressed the retroactivity of the Coal Industry Retiree Health Benefit Act of 1992 (Coal Act), 26 U.S.C. §§ 9701–9722 (1994). *See Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 2149, 141 L.Ed.2d 451 (1998). The Court struck down the Coal Act, with a plurality of four justices finding that it violated the Takings Clause of the Fifth Amendment of the Constitution. Justice Kennedy disagreed with the plurality's reasoning, finding that the Coal Act did not violate the Takings Clause, but concurred in the judgment, concluding that the Act did violate the Due Process Clause. To understand the degree to which the Court's holding is or is not applicable to the instant action, it is necessary to review the extensive factual background of the litigation.

After a tumultuous period of labor disputes, highlighted by President Truman's decision to nationalize the coal industry in 1946, the coal operators and the United Mine Workers of America (UMWA) entered into labor agreements in 1947 and 1950 that created a multi-employer trust to provide pension and medical benefits to miners and their families. The trust was funded by payment of a royalty of 30 cents per ton of coal produced by signatory operators on a several, rather than a joint, basis. The original agreement did not guarantee lifetime benefits for miners and stated that benefits could be adjusted in the future. Although minor changes were made annually to the 1950 agreement, the next major revision came in 1974, when changes were required to bring the trust program into compliance with the Employee Retirement Income Security Act (ERISA). The 1974 agreement dramatically expanded benefits to cover retirees until their death and their widows until death or remarriage. However, in spite of this expansion, there was no consequent alteration to the employers' obligation to contribute to the trust. This eventually led to funding problems, causing large

numbers of employers to drop out of the benefit plans. This, in turn, placed tremendous pressure on the remaining employers and led to large deficits in the trust account. In 1992, Congress attempted to address these problems by passing the Coal Act, which merged the 1950 and 1974 benefit plans into a single, multi-employer plan (the Combined Fund). The Combined Fund was to provide the same health benefits to retirees that they had received as workers under the 1950 and 1974 plans. The Act provided that these benefits would be financed by annual premiums against any coal operator who had both signed any agreement requiring contributions to either the 1950 or 1974 plans, and who still "conducts or derives revenue from any business activity, whether or not in the coal industry." Under the Act, a statutory formula was used to assign retired miners to specific operators and former operators. The operators and former operators were then required to pay the premiums for the retirees assigned to them.

Eastern Enterprises was a coal operator until 1965. From 1947 through 1965, it signed onto all of the relevant labor agreements, including the 1950 agreement, and contributed over $60 million to the benefit funds. In 1965, however, it sold its coal business to a subsidiary but continued to operate in other fields of business.[2] Even though it had abandoned the coal business in 1965, and, therefore, never signed the 1974 agreement, under the 1992 Act's formula for assigning retirees and premiums, Eastern was assigned more than 1000 retirees with annual premiums exceeding $5 million. The parties estimated that this would ultimately cost Eastern between $51 million and $100 million. Eastern claimed that this assessment was a violation of the Due Process and Takings Clauses of the Constitution and sought a declaration that it could not be forced to undertake this burden. Two lower courts ruled against Eastern and the Supreme Court granted certiorari.

Writing for a plurality of four justices, Justice O'Connor found that the Coal Act was a violation of the Takings Clause of the Fifth Amendment. Acknowledging that this was not the classic example of a "taking", the plurality found that government action was threatening to deprive Eastern of its property for a public purpose and that this was enough to trigger constitutional protections. Reviewing several decisions in which the Court had found that economic legislation imposing retroactive liability on companies was constitutional, the plurality concluded that these decisions "have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." 118 S.Ct. at 2149.

After determining that a regulatory takings analysis was appropriate, the plurality then addressed the "three factors that traditionally have informed our regulatory takings analysis": economic impact; interference with reasonable investment-backed expectation; and the nature of the governmental action. As to the first factor, the plurality found that the Coal Act imposed a "considerable financial burden upon Eastern," given the $51 million to $100 million estimated exposure. The plurality emphasized that in the Court's previous decisions declining to find a regulatory taking, "the statutory liability was linked to the employers' conduct." *Id.* at 2150. Eastern's liability, however, bore no relationship "to responsibilities that Eastern accepted under any benefit plan the company itself adopted," or to any of its conduct. *Id.* The plurality noted that during the years Eastern was an operator, benefits for miners and their families were far less extensive than after 1974, and, in addition, benefits were unvested and subject to alteration or termination during that time. Therefore, Eastern "could not have con-

**2.** When Eastern left the coal business, the benefit fund had a large surplus.

templated liability for the provision of lifetime benefits to the widows of deceased miners, a beneficiary class that is likely to be substantial." *Id.*

As to the second factor, the plurality determined that "the Coal Act substantially interferes with Eastern's reasonable investment-backed expectations." *Id.* at 2151. Noting that "[r]etroactivity is generally disfavored in the law," *id.,* the plurality found that "the Coal Act operates retroactively, divesting Eastern of property long after the company believed its liabilities under the 1950 [benefit fund] to have been settled." *Id.* at 2152 (stating that it would not have been possible for an employer to view lifetime medical benefits as being promised until the 1974 revisions, nine years after Eastern left the business). Again, the plurality distinguished these facts from previous cases upholding retroactive liability by noting that "the Coal Act's scheme for allocation of Combined Fund premiums is not calibrated either to Eastern's past actions or to any agreement—implicit or otherwise—by the company." *Id.*

Finally, the plurality found the nature of the governmental action to be "quite unusual" in that it "single[d] out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused." *Id.* at 2153. Therefore, the plurality found the "disproportionate and severely retroactive burden upon Eastern" to be unconstitutional. *Id.* at 2153. Because the Court found the Coal Act to be unconstitutional under the Takings Clause as applied to Eastern, it declined to address Eastern's Due Process claim.

Justice Kennedy, concurring in the plurality's judgment but dissenting as to its reasoning, found that the Coal Act did not create an unconstitutional taking because there was no "specific property right or interest ... at stake." *Id.* at 2155. However, Justice Kennedy went on to find that the severe and retroactive nature of the Coal Act offended the Due Process Clause of the Fifth Amendment. Justice Kennedy specifically noted that although the imposition of liability on former employers based on past employment relationships could be valid " 'when clearly just and reasonable, and conducive to the general welfare,' " the Coal Act did not serve this purpose as applied to Eastern because Eastern was in no way responsible for either the retired miners' expectation of lifetime health benefits or for the perilous financial condition of the benefit plans. *Id.* at 2159 (quoting 1 J. Kent, Commentaries on American Law *455–56). Because severe, retroactive liability was being imposed without any connection to Eastern's conduct or any obligation it had affirmatively undertaken, Justice Kennedy found that this constituted the "most egregious of circumstances" under which "[s]tatutes may be invalidated on due process grounds." *Id.* In opinions filed by Justice Stevens and Justice Breyer, the remaining four justices concluded that the Coal Act violated neither the Due Process Clause nor the Takings Clause.

### C. Post–Eastern Enterprises Cases

Only two courts have addressed directly the issue of whether the Supreme Court's decision in *Eastern Enterprises* warrants a reexamination of the constitutionality of the retroactive application of CERCLA. In *United States v. Vertac Chemical Corp.,* 33 F.Supp.2d 769 (W.D.Ark.1998), a district court concluded that "there is no basis to warrant reconsideration of the constitutionality of CERCLA." *Id.* at 785 (finding that *"Eastern Enterprises* is not applicable"). The court declined to permit the defendant to re-litigate the liability issue, noting that it had "previously found CERCLA constitutional in the face of a retroactivity argument."

In *United States v. Alcan Aluminum Corp.,* 49 F.Supp.2d 96 (N.D.N.Y.1999), another district court came to the same conclusion. That court rejected the defendant's argument that *Eastern Enterprises*

effectively overruled all previous decisions " 'holding that CERCLA could be constitutionally applied retroactively,' " *id.* at 98, finding both that the plurality's decision has no precedential weight and that even if it did have precedential weight it is inapplicable to CERCLA. In reaching that conclusion, the court noted that five Justices on the Supreme Court rejected the plurality's view that the Takings Clause applies to "ordinary liabilit[ies] to pay money.' " *Id.* at 99. Therefore, the court determined that the plurality's decision is not binding precedent. *Id., citing Hertz v. Woodman,* 218 U.S. 205, 213–14, 30 S.Ct. 621, 54 L.Ed. 1001 (1910) ("The principles of law involved not having been agreed upon by a majority of the court sitting prevents the case from becoming an authority for the determination of other cases, either in [the Supreme Court] or in inferior courts").

The court further found that even if *Eastern Enterprises* could be considered binding precedent, CERCLA would still be constitutional under the Takings Clause because liability under CERCLA always requires a factual finding of contribution to the environmental harm. Moreover, in a CERCLA action the defendant has the opportunity to lessen its damages by proving during an apportionment hearing that it had not made a significant contribution to the environmental harm. Therefore, the defendant's exposure would not be severe or disproportionate in the same sense as in *Eastern Enterprises.*[3]

The *Alcan* court also found it to be a crucial distinction that whereas Eastern had not participated in the conduct that had led to the funding crisis which indirectly led to its liability, the CERCLA liability of the defendant in *Alcan* was "predicated on the link between its waste disposal activities and the environmental harms caused ...." Although the Coal Act's liability was " 'not calibrated either to Eastern's past actions or to any agreement,' ... CERCLA liability triggers current and future liabilities on the basis of past actions." *Id.* at 100, *quoting Eastern Enterprises,* 118 S.Ct. at 2136. The court went on to find that the due process issues related to the constitutionality of retroactive liability under CERCLA were unchanged by *Eastern Enterprises,* as only a single justice relied upon due process to find the Coal Act unconstitutional, and that there is a rational basis for imposing this liability. *Id.* at 100, *citing Association of Bituminous Contractors, Inc. v. Apfel,* 156 F.3d 1246, 1254–55 (D.C.Cir.1998).

Although no other courts have addressed directly this specific issue, two circuit courts have determined that the *Eastern Enterprises* plurality decision holds no precedential weight beyond its facts. *See Association of Bituminous Contractors,* 156 F.3d at 1255 (finding that because Justice Kennedy's opinion cannot be considered a "narrower holding" entitled to precedential weight, "the only binding aspect of *Eastern Enterprises* is its specific result-holding the Coal Act unconstitutional as applied to Eastern Enterprises"); *Anker Energy Corp. v. Consolidation Coal Co.,* 177 F.3d 161, 170 (3d Cir.1999) (same).

## II.   Summary Judgment

Puritan argues that the plurality opinion in *Eastern Enterprises,* combined with Justice Kennedy's concurrence reflect "a new respect ... for the rights of individuals and businesses facing retroactive application of severe economic burdens under federal law" which "mandates that courts now re-examine the constitutionality of a purely retroactive application of CERCLA to conduct that occurred before its enactment." Moreover, Puritan contends that *Eastern Enterprises* requires an examination of the fairness or unfairness of the retroactive application of punitive laws as applied to each particular class of persons. In this new light, Puritan urges that the Fourth Circuit's conclusion in *Monsanto*

---

**3.**   Furthermore, the court noted that the $5 million at issue in *Alcan* was significantly less than the $50 million to $100 million at issue in *Eastern Enterprises.*

that CERCLA's retroactive application was constitutional does not preclude a new investigation into the constitutionality of that application to Puritan. Puritan also contends that the decisions of the district courts in *Alcan* and *Vertac Chemical* are "simply wrong and inconsistent with" *Eastern Enterprises.*

Greenbriar LP, Morrow, and Greenbriar–50 all respond that *Eastern Enterprises* is inapplicable to this cases for essentially the reasons stated in *Alcan.* They argue that the Supreme Court's decision has no precedential weight and that even if it did, it would not apply to this case. These parties argue that if Glover and Puritan are found to have violated CERCLA, as is assumed for the purposes of this motion, then this case is easily distinguishable from *Eastern Enterprises,* in which Eastern's liability was not related in any way to its conduct or to any obligations it had undertaken. CERCLA liability is predicated on a party's actions.

We disagree with plaintiff's view and conclude, as have the *Alcan* and *Vertac Chemical* courts, that the Supreme Court's decision in *Eastern Enterprises* does not undercut the constitutionality of retroactive liability under CERCLA. Justice Kennedy's concurrence in the judgment was based on an entirely different rationale from the plurality's decision. Therefore, no single theory of law was adopted by a majority of the Court, and *Eastern Enterprises* is not entitled to any precedential weight. As a result, the Fourth Circuit's decision in *Monsanto,* finding that the retroactive application of CERCLA is constitutional, has not been disturbed and remains controlling. 858 F.2d at 174.

Furthermore, even if *Eastern Enterprises* did have precedential weight, it would not be applicable to the instant action because Eastern's liability was not predicated on either its conduct or on any agreement that could have given rise to an expectation that it might be held liable. If Puritan is found liable under CERCLA, it will be as a result of its own conduct in disposing of the toxic chemical PCE, which allegedly caused harm to the environment, because, unlike Eastern, Puritan is alleged to have played a role in creating the very harm that the statute at issue is designed to remedy. *See Alcan,* 49 F.Supp.2d at 100 ("[R]etroactive liability under CERCLA is appropriate because it concerns environmental harms connected to the actions of parties like" the defendant.).

Moreover, we find that the potential economic impact on Puritan, while substantial, is not severe and disproportionate. Puritan mistakenly argues that the estimated $1 million in potential liability is severe and disproportionate because it is excessive when compared to the small amount of money it netted from running the dry cleaning business and the $45,000 for which it sold the business in 1974. This argument misses the point. The relevant measuring stick is not the economic benefit received by the parties but the harm caused by their actions. That issue is still a matter of dispute.

Lastly, we find that retroactive application will not significantly interfere with Puritan's reasonable investment-backed expectation, as that concept is discussed in *Eastern Enterprises.* Although it is true that Puritan probably did not consider that it would be involved in this kind of an action when it disposed PCE waste from 1969 to 1974, it is not unfair to hold parties liable for the consequences of their actions, especially when those actions affect the environment, in which all members of the community share. In *Eastern Enterprises,* the plurality emphasized that the reason it found that Eastern's liability interfered with its reasonable investment-based expectation was because liability was not predicated on Eastern's actions or on any obligations it had assumed. We infer from this that if liability had been premised on Eastern's actions, even if those actions had occurred before the Coal Act was passed, the plurality would not have found that this had interfered with Eastern's expectations. In the instant action, we find no

interference with Puritan's reasonable investment-based expectations because Puritan should have reasonably expected that it might have liability based on its actions. Similarly, the nature of the government action in this case is not suspect because it "does not impose liability absent a basis." *Alcan*, 49 F.Supp.2d at 100.

## CONCLUSION

For these reasons, we will DENY third-party defendants/third-party plaintiffs J. Edward Glover's and Puritan Systems, Inc./Progressive Cleaners' Motion for Summary Judgment.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.