43 P.3d 471 (2002)
145 Wash.2d 750
ASARCO INCORPORATED, Respondent,
v.
DEPARTMENT OF ECOLOGY, and Thomas C. Fitzsimmons, Director of the Department of Ecology, Appellant.
No. 69406-1.
Supreme Court of Washington, En Banc.
Argued May 31, 2001.
Decided March 21, 2002.
Christine Gregoire, Attorney General, Mary Sue Wilson, Asst., Ronald L. Lavigne, Asst., Andrew A. Fitz, Asst., Olympia, for Appellant.
Heller, Ehrman, White & McAuliffe, Timothy H. Butler, Seattle, Covington & Burling, Peter J. Nickles, Washington, DC, for Respondent.
Michael James Zevenbergen, Seattle, Lois J. Schiffer, David C. Shilton, Karen M. Wardzinski, R. Justin Smith, Washington, DC, amicus curiae.
Mark Thormod Soine, Everett City Attorney, Everett, Rodney L. Brown, Kurt Bradley Peterson, Seattle, Marten, Brown, Jennifer Tanya Barnett, Olympia, Foreman & Arch, Dale Melvin Foreman, Wenatchee, Preston, Gates, Ellis, Fredric Tausend, Kenneth Stuart Weiner, John Craig Bjorkman, Seattle, Christine Gregoire, Attorney General, amicus curiae.
Eric Nelson, Asst., Olympia, Jonathan T. Stier, Charles Craig Caldart, Raymond Brent Walton, Mikkelborg, Broz, Wells & Fryer, amicus curiae.
John Earl Lenker, Newell David Smith, Seattle, Daniel J. Popeo, Paul D. Kamenar, Washington Legal Foundation, Washington, DC, amicus curiae.
Russell C. Brooks, amicus curiae.
*472 CHAMBERS, J.
We must determine whether a preemptive challenge to a possible Washington State Department of Ecology enforcement action under the Model Toxics Control Act is justiciable. We conclude it is not.

FACTUAL BACKGROUND
In 1894, the Puget Sound Reduction Company of West Virginia began operating a smelter on a 44 acre site in Everett, Washington. Arsenic and lead were smelted there for sale. In 1903, a corporation that eventually became the modern day Asarco purchased the smelter and continued the business. By 1912, smelting and arsenic recovery was ended, and by 1937, all of the 44 acre smelter property was sold to different buyers, including private land owners, the City of Everett, the State Department of Transportation, Burlington Northern and the Weyerhaeuser Company.
Unheeded at the time was the lingering legacy of the smelter operation, arsenic and lead in the soil in amounts ranging up to 760,000 parts per million for arsenic alone.
In 1980, the United States enacted the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601-9675, which imposes strict, joint and several liability for environmental damage on past and present owners of contaminated property as well as the polluters and the transporters of pollution. CERCLA has been vigorously litigated in state and federal courts, and has been consistently upheld as constitutional.
In 1988, the voters in the state of Washington passed Initiative 97, the Model Toxics Control Act (MTCA) (chapter 70.105D RCW). MTCA was modeled on CERCLA, and we have found CERCLA case law persuasive in interpreting MTCA. See Bird-Johnson Corp. v. Dana Corp., 119 Wash.2d 423, 427, 833 P.2d 375 (1992). Like CERCLA, MTCA establishes a mechanism to clean up hazardous waste sites. MTCA is administered by the Washington State Department of Ecology, which was granted investigatory and enforcement powers. Limited state funds are raised for clean up projects through a tax on hazardous waste, but for the most part, clean up is paid for and performed by those public or private entities identified by Ecology as "potentially liable persons." Potentially liable persons include the current and former property owners, polluters, and transporters of waste. Potentially liable persons are jointly and severally liable, and liability is strict, though potentially liable persons have a statutory right to seek contribution from others potentially liable under the statute. RCW 70.105D.040(2),.080.
In 1990, Weyerhaeuser discovered evidence of elevated levels of arsenic, lead, and cadmium at the old smelter site, and informed Ecology. Ecology investigated and consequently identified the smelter site and 642 acres surrounding it as a hazardous waste site. In 1991, Ecology informed Asarco that it was proposing to find Asarco a potentially liable person for the clean up on a site that ultimately included the old 44 acre smelter site and 642 acres surrounding it, including lowlands to the east of the old smelter site and uplands to the west. (See following diagram.) At that time, Ecology also tentatively identified Weyerhaeuser, Burlington Northern, the Washington State Department of Transportation and the City of Everett as potentially liable persons. Ecology ultimately determined Asarco was a potentially liable person and decided not to make a final determination of the status of the other four entities, leaving Asarco free to bring a contribution action against them.
Initially, Asarco cooperated with Ecology. Between 1991 and June 1998 Asarco investigated the site; laid the groundwork for the eventual clean up; took some steps to protect the residents from exposure to toxic metals; and purchased 7-2 acres of heavily polluted residential properties on the former smelter site.[1] As of June 1998, Asarco had spent about $11 million on these efforts, including testing of residents for elevated lead and arsenic levels. No evidence of elevated lead
*473 *474 or arsenic levels in local residents was presented at trial.
Unfortunately, it became clear that Ecology and Asarco would not agree on the ultimate clean up standards. Asarco offered to clean up the site to a level of 230 parts per million (ppm) of arsenic and 500 ppm for lead, similar to that applied by the United States Environmental Protection Agency (EPA) to the Alcoa site in Ruston. According to Asarco, Ecology unreasonably adhered to the lower levels of 20 ppm for arsenic and 353 ppm for lead.[2]
On June 25, 1998, the United States Supreme Court published Eastern Enterprises v. Apfel, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998). Eastern Enterprises invalidated the application of a pension and health care funding system established by Congress against a specific company as unconstitutional. However, the Court could not agree on which provision of the United States Constitution was violated. The funding system's retroactivity offended five members of the Court: three on a takings theory, one on a takings and ex post facto theory, and one on a substantive due process theory. Only four justices signed on to the majority opinion, and four justices dissented.
Five days after the Supreme Court filed the Eastern Enterprises decision, Asarco brought a declaratory judgment action in Thurston County Superior Court asking the trial court to find MTCA unconstitutional as applied to them.[3] Asarco argued: (1) MTCA's joint and several strict liability for past pollution violated due process, (2) retroactive application of MTCA was a takings, (3) the liability schema violated equal protection, (4) Ecology's regulations were arbitrary and capricious, (5) the enforcement and penalty provisions of MTCA violated due process, and (6) the specific clean up standards Ecology was likely to order were arbitrary and capricious.
Ecology moved for summary judgment, arguing the issue was not ripe for review and the conditions for judicial review laid out in MTCA had not been met. Ecology asked the case be deferred until the final clean up order was entered. When the declaratory judgment action was filed, there was no final order for the uplands, and no draft plan for the lowlands.[4] The record does not reveal whether the old smelter site would be cleaned in a separate plan. Since there was no final order, there was no meaningful opportunity for court review of the burdens and benefits of clean up.
The trial judge dismissed claims (4) through (6), but allowed the "as applied" constitutional challenges to go forward.[5] Shortly before trial, Ecology issued a final clean up plan for a portion of the hazardous waste site, and indicated the clean up plan for the remainder would be issued in 2001.[6] *475 The parties proceeded to trial, but did not litigate the specifics of the uplands plan. Instead, their arguments focused on whether the retroactivity of MTCA as applied to Asarco rendered it unconstitutional.
The trial judge found retroactive application of MTCA requiring Asarco to the actual smelter site did not offend the United States Constitution, because Asarco could have anticipated clean up liability for leaving soils highly contaminated on its property. However, he found requiring Asarco to clean the surrounding 642 acres did violate due process principles and was an unlawful takings of property based on the disproportionality of the damage caused by Asarco versus the liability imposed on Asarco.[7]
Both sides sought discretionary review in this Court. Asarco contends the trial court erred in holding it responsible for cleaning up the original smelter site; Ecology contends the trial court erred in concluding Asarco could not be held liable constitutionally for cleaning the surrounding polluted area. We granted review.

ANALYSIS
While this case presents significant constitutional questions, first we must determine whether review is appropriate given the procedural posture of the case. Ecology has argued from the beginning of this case that the trial court lacked jurisdiction over the constitutional questions before the entry of the final enforcement order.[8]
The ripeness doctrine exists "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148-49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).
Asarco presents us with a justiciability conundrum; while this is an "as applied" challenge, nothing has been applied. The mere convenience to Asarco of deciding the controversy ahead of Ecology's clean up order is not enough to ripen the claim. If we find "applied challenges" justiciable before anything has been applied, we risk becoming an advisory court and overstepping our constitutional authority. Further, general constitutional challenges could be disguised as a more limited "as applied" challenge. One should not substitute for the other.
Justiciability requires:
"`(1) ... an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive.'"
First United Methodist Church of Seattle v. Hearing Exam'r, 129 Wash.2d 238, 245, 916 P.2d 374 (1996) (quoting First Covenant Church v. City of Seattle, 114 Wash.2d 392, 398, 787 P.2d 1352 (1990) (quoting Diversified Indus. Dev. Corp. v. Ripley, 82 Wash.2d 811, 815, 514 P.2d 137 (1973))). Clearly, (4) is not present here, as this case is not developed sufficiently for this Court to render a decision which will conclude the matter.
Even if this Court was to find the case justiciable, we could not resolve with finality the specific challenges brought by Asarco. The learned judge below depended heavily on Eastern Enterprises' strong criticism of retroactive civil liability, but subsequent federal case law development has demonstrated the limited precedential scope of Eastern Enterprises.[9]
*476 While Ecology is not seeking to physically take the land, less intrusive government action can constitute a regulatory taking. A regulatory taking exists when the regulation of land "goes too far." Pa. Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). "A court cannot determine whether a regulation has gone `too far' unless it knows how far the regulation goes. `[It] is a question of degreeand therefore cannot be disposed of by general propositions.'" MacDonald, Sommer & Frates v. County of Yolo, 477 U.S. 340, 348, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986) (quoting Pa. Coal, 260 U.S. at 416, 43 S.Ct. 158).
To determine whether a specific government action constitutes a regulatory takings, we apply the Connolly three part test, directing the court to make an ad hoc, factually specific analysis of: "`(1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations, and (3) the nature of the governmental action.'" Eastern Enters., 524 U.S. at 518, 118 S.Ct. 2131 (quoting Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 224-25, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986)). Prior to the order and contribution action, we cannot determine (1) or (2). We have no record to determine what level of clean up might be reasonable. We have nothing in the record but speculation as to how much the clean up might cost. Nor do we know the economic impact of the order, or the extent to which the order will interfere with distinct investment backed expectations. Therefore, the takings claim cannot be resolved, and is rejected.
Asarco urges that we decide this case under substantive due process. It urges us to find the retroactivity sufficient to establish a violation of the Fourteenth Amendment to the United States Constitution, which prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." We decline to do so. This Court established an analytical framework for analyzing whether a regulation violates substantive due process. Presbytery of Seattle v. King County, 114 Wash.2d 320, 787 P.2d 907, cert. denied, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990). Since Presbytery, Washington courts apply a three-pronged test:
(1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner.
Presbytery, 114 Wash.2d at 330, 787 P.2d 907.[10] We observed the third inquiry would usually be the most difficult to meet:
The "unduly oppressive" inquiry lodges wide discretion in the court and implies a balancing of the public's interest against those of the regulated landowner. We have suggested several factors for the *477 court to consider to assist it in determining whether a regulation is overly oppressive, namely: the nature of the harm sought to be avoided; the availability and effectiveness of less drastic protective measures; and the economic loss suffered by the property owner.
Presbytery, 114 Wash.2d at 331, 787 P.2d 907.
The record before us does not permit us to make a substantive due process analysis under our case law. While the harm sought to be remedied is significant, there is no record on the availability and effectiveness of less drastic protective measures. This issue should be litigated at the trial court, for example, when a potentially liable person is resisting an enforcement order. There is little evidence on the economic loss that Asarco may suffer,[11] nor do we know whether the means are reasonably necessary to achieve the purpose.

CONCLUSION
We conclude the case is not justiciable. We therefore vacate the trial court's order below and dismiss this case without prejudice to either party to raise the same issues in any appropriate further proceeding.
ALEXANDER, C.J., SMITH, JOHNSON, MADSEN, IRELAND, and OWENS, JJ., concur.
SANDERS, J. (dissenting).
[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.[[1]]
Substantively this appeal challenges the Washington Model Toxics Control Act (MTCA), chapter 70.105D RCW, as applied against Asarco. The trial court concluded the case was ripe for adjudication and the constitutional issues were appropriate for resolution. It held application of the MTCA to Asarco violated the Fifth and Fourteenth Amendments guaranties by taking Asarco's property without just compensation and, additionally, depriving Asarco of its property absent that process constitutionally due with respect to 642 of the 686 acre site. Clerk's Papers (CP) at 17 (Finding 1), 13 (Conclusion P, T), 14 (Conclusion V). A direct appeal to this Court by the Department of Ecology ensued, as well as a cross-appeal by Asarco.
We granted direct review because of the importance of the substantive issues raised. However, the majority declines to reach the merits, opining instead the case is not "ripe" for review nor is it "justiciable." I disagree. Moreover, I would hold for Asarco on the merits.

I.

Facts
This case proceeds from a bench trial conducted by the Honorable Gary R. Tabor, judge of the Thurston County Superior Court. By pretrial order, the learned trial judge identified three issues to be factually determined at trial:
a. Whether or not the retroactive liability imposed by MTCA on Asarco is severe or patently unfair;
b. Whether Asarco could have anticipated, during the period of Asarco ownership of the Everett Smelter Site (1904-1936), that there would be retroactive liability imposed in the future for its activities at the Everett Smelter Site; and
c. Whether the extent of the liability imposed on Asarco is disproportionate to the actions of Asarco for which it is being held liable.
CP at 16. At the conclusion of trial Judge Tabor made 88 separate findings of fact, followed by 29 separate paragraphs embodying his conclusions of law. CP at 9-33.
*478 Ecology grumbles about the factual findings but does not comply with RAP 10.3(g) by properly assigning separate error to each challenged finding on penalty that "[t]he appellate court will only review a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto." Nor does Ecology set forth verbatim any challenged factual finding as required by RAP 10.4(c). For that matter, Asarco does not assign error to any factual finding either. Therefore the findings of the trial court must be considered verities for the purpose of this appeal. See Dumas v. Gagner, 137 Wash.2d 268, 280, 971 P.2d 17 (1999).
In pertinent part, therefore, I will identify some of the findings critical to review. The specificity and organization of the trial court findings, which are categorized under several general subject headings, facilitate this task.
A. Site History
The entire Everett site encompasses 686 acres. This includes only 44 acres of land historically owned by Asarco (although long since sold) where the actual smelter was located. The remaining land surrounds it. All of the site had been owned by a variety of different owners. CP at 17 (Finding 1).
The Puget Sound Reduction Company of West Virginia (PSRC 1), a company no longer in existence, built the smelter in 1892 and operated it through 1901. CP at 17-18 (Findings 2-5). Thereafter the Puget Sound Reduction Company of Washington (PSRC 2) acquired the smelter in 1902, ultimately selling it to Federal Mining and Smelting Company which immediately resold it to Asarco in 1903. CP at 18 (Finding 7). The smelter then was shut down; however, it started operation again in 1904 and phased out its operation until its complete closure in 1912. CP at 18 (Findings 8-11). By 1936 Asarco had sold all of the 44 acre actual smelter property to third persons. CP at 18 (Finding 12). It never owned the remainder of the area for which Ecology would hold it liable for clean up.
B. Regulatory History (1988-Present)
The MTCA was adopted in 1988 by initiative and became effective on March 1, 1989. It created "new and potentially massive liabilities that did not exist previously under Washington law." CP at 19 (Finding 13).[2] Pursuant to RCW 70.105D.030, the act empowered Ecology to investigate and remediate hazardous waste sites or to order potentially liable parties (PLPs) to do so. CP at 19 (Finding 13). Under RCW 70.105D.040, the act defined PLP to include present or past owners and operators of the facility and imposed a rule of strict liability, requiring each PLP to be jointly and severally liable for all remediation costs. CP at 19 (Finding 13).
Moreover, the MTCA contains severe penalty provisions in RCW 70.105D.050(1) that penalize a PLP, which refuses without sufficient cause to comply with an Ecology order, three times the costs incurred by the State plus civil penalties of up to $25,000 per day. CP at 19 (Finding 14). The regulations adopted under the MTCA do not require evidence of actual harm or the probability of harm at a particular site. CP at 19 (Finding 15). WAC 173-340-700(3)(b) requires hazardous substances on site known to cause cancer be removed to reduce the risk of harm to a level of one in a million. CP at 19 (Finding 15).
Ecology investigated the site in 1990 and in 1991 finally designated Asarco as a PLP (although it decided not to make a final decision as to other potential PLPs). CP at 19-20 (Findings 16-20). Since 1991 Asarco has actually spent over $11,000,000 attempting to comply with Ecology's enforcement orders,[3] notwithstanding the absence of any evidence Everett residents in fact experienced an actual elevated level of lead or arsenic. CP at 20 (Finding 22).
*479 Ecology has divided the site into an Uplands portion and a Lowlands portion. CP at 21 (Finding 23). In November 1999 Ecology issued a final clean-up action plan (CAP) for the Uplands and anticipated issuance of a clean-up plan for the Lowlands in 2001. CP at 21 (Finding 23).
C. De Facto Consolidation Issue
Asarco operated the smelter for only a small portion of time during its total period of operation. CP at 21-24 (Findings 27-48).
D. Fairness Issue
Asarco discontinued smelter operations in the site in 1908, 81 years before enactment of the MTCA, and discontinued remaining operations by 1912, 77 years before enactment of the MTCA. CP at 24 (Finding 49). It sold all of its Everett property by 1936, 53 years before enactment of the MTCA. CP at 24 (Finding 49).
Asarco's smelter operations during the time in question were representative of the then-available metal recovery technology, and lead and arsenic recovery rates at the facility compared "very favorably to recovery rates at other facilities." CP at 24 (Finding 52).
"Ecology intends to impose upon Asarco the entire cost of remediating the Everett Site, which consists of Uplands and Lowlands portions." CP at 25 (Finding 53). The estimated cost of remediating the Uplands in accordance with the draft CAP is approximately $78,000,000. CP at 25 (Finding 54). This figure does not include the clean-up costs for the Lowlands. CP at 25 (Finding 54).
E. Anticipation Issue
Regulations adopted pursuant to the MTCA do not require evidence of actual or even probable harm. CP at 25 (Finding 56). Ecology's standards require remediation to an arsenic level of approximately one part per million. CP at 26 (Finding 59) (applying soil clean-up level equation in WAC 173-340 740(3)(a)(iii)(B)). This is lower than the natural background level for arsenic. CP at 26 (Finding 60).[4]
Current clean-up standards substantially exceed standards existing prior to 1937. CP at 27-30 (Findings 62-80). "Asarco could not have anticipated, during the pre 1937 period, a need to clean up soils in order to prevent ingestion of arsenic, particularly at the doses that are present in the approximately 650 acres of land surrounding the 44 acre former Everett Smelter Site." CP at 27 (Finding 63). Using the MTCA's factual assumptions, "it would take a person approximately seven million days (or 280 lifetimes) to reach a cumulative exposure of arsenic from this site sufficient to cause cancer pursuant to scientific thought prior to 1937." CP at 27 (Findings 64-65). Under current standards, however, "one small bite of a pre-1937 apple containing arsenic at the regulated limit would have exceeded the arsenic exposure Ecology seeks to prevent." CP at 27 (Finding 66).
In summary, "Asarco could not have anticipated, during the pre 1937 period, a need to clean up soils in order to prevent ingestion of lead." CP at 28 (Finding 68). Moreover, "Asarco could not have anticipated in the 1903-1937 period that Ecology's risk assessment methodology would be utilized to decide that offsite Everett soils required remediation." CP at 29 (Finding 73). Further, the trial court expressly found:
It is inconceivable that Asarco, before 1937, could have anticipated the application of risk standards designed to limit exposures to risk levels such as one in a million.
CP at 30 (Finding 78).
The trial court did, however, find Asarco could have anticipated clean-up liability for soil with high levels of lead and arsenic for the 44 acres on which the smelter was actually located. CP at 30 (Finding 81). But the trial court did not specify what those levels might be nor did it set forth specific facts to support this conclusion.
*480 F. Disproportionality Issue
"Ecology seeks to impose upon Asarco the entire cost of remediating the Everett Site." CP at 31 (Finding 84). Although some evidence indicated it was much lower, the trial judge found "[f]or purposes of rendering [this] decision, [he would] accept Ecology's argument that Asarco contributed 30 percent of the arsenic emissions and PSRC 1 and PSRC 2 contributed 70%." CP at 32 (Finding 86).
Therefore, in summary, the trial court found (1) the MTCA and Ecology imposed retroactive liability against Asarco for a period approaching a century; (2) Asarco would be liable for 100 percent of clean-up costs; (3) these costs exceed $78,000,000; (4) Asarco actually caused, at most, approximately 30 percent of the problem; and (5) Asarco's operations were lawful at the time undertaken and it could not have reasonably anticipated its activities would expose it to legal liability for most of the site.

II.

Justiciability and Ripeness
With respect to ripeness, Ecology has formally designated Asarco as a PLP; Ecology has already determined Asarco must pay 100 percent of the clean-up costs; and those clean-up costs, although not finally and exactly determined, will exceed $78,000,000. Notwithstanding, the majority claims this action is not ripe and/or does not present a justiciable issue.
This is a declaratory judgment action relying on two constitutional theories: takings and due process. Asarco is not seeking a money judgment but rather declaratory and injunctive relief. Keeping these factors in mind we must analyze justiciability under our Uniform Declaratory Judgments Act and then apply those considerations, including ripeness, to both the takings and due process claims.
A. Declaratory Judgment Action
Declaratory judgment actions are governed by the Uniform Declaratory Judgments Act, chapter 7.24 RCW. A person may seek a declaration on "any question of... validity" of a statute when the statute affects the person's legal rights. RCW 7.24.020. Declaratory judgment actions are appropriate to determine the constitutionality of a statute. See, e.g., Soundgarden v. Eikenberry, 123 Wash.2d 750, 871 P.2d 1050 (1994). More specifically, declaratory judgment actions are appropriate for "as-applied" constitutional challenges. See, e.g., Spokane County v. State, 136 Wash.2d 663, 666, 966 P.2d 314 (1998) (as-applied challenge to Public Employees' Collective Bargaining Act, chapter 41.56 RCW); First United Methodist Church of Seattle v. Hearing Exam'r, 129 Wash.2d 238, 916 P.2d 374 (1996) (as-applied challenge to Seattle's Landmarks Preservation Ordinance).
An action for a declaration that a statute is invalid, or is about to be applied invalidly, is not premature merely because the statute has not yet in fact been applied. Soundgarden, 123 Wash.2d at 754, 871 P.2d 1050 (allowing declaration judgment action even though statute had not been enforced); Allied Daily Newspapers of Wash. v. Eikenberry, 121 Wash.2d 205, 848 P.2d 1258 (1993) (allowing declaratory judgment action concerning future enforcement of newly enacted statute). "`[A] declaratory judgment action will lie to determine the validity of rights under a statute, even though no steps have been taken to enforce it....'" Peterson v. Hagan, 56 Wash.2d 48, 66, 351 P.2d 127 (1960) (quoting Berndson v. Graystone Materials Co., 34 Wash.2d 530, 538, 209 P.2d 326 (1949) (quoting Walter H. Anderson, Actions for Declaratory Judgments § 68, at 192 (1940))). Thus, even assuming (as does the majority) that the MTCA has not "been applied," see majority at ____, that would not bar Asarco's declaratory judgment action.
That is the case because a declaratory judgment action is mature if there is practical likelihood of a future controversy. See 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2757, at 477 (1998). "[W]hen the threat of prosecution under a challenged statute is real, a declaratory judgment on the constitutionality of the statute is appropriate." Id. at 486-87. Given the 10-year history of Ecology's targeting Asarco as a PLP *481 and issuing MTCA enforcement orders, and also considering Ecology has now issued a final CAP for the Uplands portion of the site holding Asarco totally and strictly liable, a future controversy is not just likely, it has arrived.
The critical point in the process that ripened Asarco's as-applied constitutional challenges to the MTCA was the final administrative determination that it is a PLP. RCW 70.105D.050 grants Ecology authority to order remedial action against any PLP and subjects it to harsh penalties to force compliance. WAC 173-340-500 sets forth the procedure whereby one may be designated as a PLP, which culminates in the issuance of a "determination of potentially liable person status." Such a determination was made with respect to Asarco. That final determination matured this case.
The majority also states Asarco's declaratory judgment action is not justiciable. See majority at 475. Specifically, the majority asserts a determination of Asarco's claim would not be "final and conclusive." Id. at 475. I disagree. If we were to declare the MTCA cannot be constitutionally applied retroactively to Asarco, that declaration would in fact finalize and conclude the matter. If we were to declare to the contrary, enforcement would be allowed to continue absent some other legal infirmity. Either way, our ruling would be final and conclusive as to the issues presented.
The procedural posture of this case is more immediate than that in First United Methodist, 129 Wash.2d 238, 916 P.2d 374. First United Methodist found justiciable a declaratory judgment action concerning the constitutionality of Seattle's Landmarks Preservation Ordinance as applied to First United Methodist Church even though the city had not utilized the statute to even enact a final designating ordinance. 129 Wash.2d at 244-45, 916 P.2d 374. Today's majority complains as the dissent did in First United Methodist that "no final action has occurred or been applied to First United Methodist." Id. at 254, 916 P.2d 374 (Dolliver, J., dissenting). Nonetheless, the Court in First United Methodist held the constitutional challenge justiciable. Id. at 244-45, 916 P.2d 374.
First United Methodist reasoned the nonfinal governmental action that had occurred (nomination for designation) in itself placed restraints on the church that sufficiently permitted the declaratory judgment action. Id. at 244, 916 P.2d 374. Nomination prohibited remodeling or selling the church property during the designation proceeding. Id. at 244-45, 916 P.2d 374. Further, the city prevented the church from making changes to the church for over 10 years. Id. at 244, 916 P.2d 374.
Here, as in First United Methodist, the governmental action against Asarco prompts a justiciable declaratory judgment action. Ecology's designation of Asarco as a PLP (and later targeting Asarco as the sole PLP), issuance of enforcement orders with penalties for noncompliance,[5] and application of the MTCA retroactively demonstrate an imminent (and actual) controversy between parties with opposing interests.
In sum, Asarco is now subject to Ecology's statutory enforcement authority. Ecology has finally determined its strict liability by identifying it as a PLP. Asarco has already spent $11,000,000. The trial court found it will be required to pay at least an additional $78,000,000. A final CAP for a portion of the site has already been issued, compelling remediation from Asarcoand Asarco alone. Asarco is the only PLP designated for the other portion of the site, as the trial court's findings of fact indicate on more than one occasion: "Ecology intends to impose upon
Asarco the entire cost of remediating the
Everett Site." CP at 25 (Finding 53), 31 (Finding 84). Without doubt Ecology is targeting Asarco as responsible for 100 percent of the clean up. Accordingly, Asarco's declaratory judgment action is justiciable.
B. Due Process Challenge
Even when a plaintiff makes a substantive due process challenge and is not seeking a *482 declaratory judgment, such a claim is actionable immediately when the alleged wrongful action is taken. Zinermon v. Burch, 494 U.S. 113, 126, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (section 1983); Daniels v. Williams, 474 U.S. 327, 338, 106 S.Ct. 677, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring) (same); Halverson v. Skagit County, 42 F.3d 1257, 1261 (9th Cir.1994) (same); see also Mission Springs, Inc. v. City of Spokane, 134 Wash.2d 947, 964-65, 954 P.2d 250 (1998); Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 21 n. 11, 829 P.2d 765 (1992) ("[A]n action for a violation of substantive due process is ripe immediately ... because the harm occurs at the time of the violation.").
Here, Asarco's due process claim was actionable immediately when Ecology applied the MTCA retroactively against Asarco. This occurred repeatedly from at least the time Ecology designated Asarco as a PLP. Thereafter it used its MTCA enforcement power to Asarco's detriment as well. As early as 1992 Ecology issued an MTCA enforcement order whereby Asarco began to conduct investigations and studies with Ecology oversight. In 1997, Ecology issued another enforcement order requiring Asarco inter alia to demolish and remove vacant homes on the former smelter site, to implement community protections, to establish a soil disposal program, and to sample and analyze soil. Asarco's claim that the MTCA cannot be constitutionally applied retroactively under these facts without violating Asarco's substantive due process rightseven if not brought as declaratory judgment action is now clearly appropriate for adjudication.
C. Takings Challenge
Ripeness is a term of art in takings jurisprudence. It does not apply to all takings claims; however, where applicable it requires (1) a final decision regarding the application of the zoning ordinance and the subdivision of regulations to the property, and (2) utilization of state procedures to obtain just compensation. See Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); see also Sintra, 119 Wash.2d at 31, 829 P.2d 765 (Utter, J., concurring).
Some takings challenges are subject to ripeness review under the Williamson County two-prong test. But this case is not one of them because ripeness considerations for takings review pertain exclusively to takings challenges premised on use restrictions, or as the majority phrases it:
"A court cannot determine whether a regulation has gone `too far' unless it knows how far the regulation goes.... [It] is a question of degreeand therefore cannot be disposed of by general propositions."
Majority at 476 (alteration in original) (quoting MacDonald, Sommer & Frates v. County of Yolo, 477 U.S. 340, 348, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986)).[6] The claim here, however, has nothing to do with use restrictions. It rather concerns direct imposition of monetary liability which Asarco contests under takings principles.
Applicability of ripeness criteria to a takings claim depends on the type of takings claim asserted. See Timothy V. Kassouni, The Ripeness Doctrine and the Judicial Relegation of Constitutionally Protected Property Rights, 29 Cal. W.L. Rev. 1, 20 (1992). Governmental actions may be subject to the takings clause (1) for failure to substantially further a legitimate governmental purpose, including failure to establish a direct and proportional nexus between the action and accomplishing the claimed purpose, see, e.g., Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 836-37, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); or (2), for deprivation of use. See Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). The takings claim here at issue does not relate to deprivation of economically viable use. Rather, the focus here is on the nature of the governmental action challenged, its "legitimacy." See Kassouni, The Ripeness Doctrine, supra, 29 Cal. W.L. Rev. at 13.
In this as-applied challenge Asarco essentially seeks to invalidate Ecology's actions on *483 the ground severe retroactive and disproportionate application of the MTCA is an improper governmental means to achieve its purpose. If successful, the remedy for such a takings violation is not "just compensation" but an injunction against enforcement and restitution of property already taken (here, Asarco's money). Takings claims based on this theory are not subject to the Williamson County ripeness requirements because the remaining uses of the land after the regulation has been applied are not at issue. See Kassouni, The Ripeness Doctrine, supra, 29 Cal. W.L. Rev. at 22-42; cf. Montgomery v. Carter County, 226 P.3d 758, 765-68 (6th Cir.2000) (Williamson County requirements not applicable to takings claim based on private-use theory).
This takings claim is no more subject to ripeness requirements than was the takings claim asserted in Eastern Enterprises v. Apfel, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), which concerned retroactive liability for health care benefits, or Nollan, which challenged an exaction on legitimacy principles, or Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994), which challenged an exaction as disproportionate.
If "finality" is required, finality was achieved when Asarco was designated a PLP for the entire site. This designation was a final administrative determination of Asarco's liability reducing the question from "what if" to "how much." Subsequent administrative orders and unchallenged findings from the trial court answered that question as well: more than $78,000,000.
Of course the ripeness prong regarding state compensation is doubly inapplicable to this situation because Asarco seeks no compensation and the case was filed in state court in any event.
For these reasons I conclude the ripeness doctrine is facially inapplicable to Asarco's claim but, even if applicable, it is amply satisfied.
Furthermore the declaratory judgment statute provides an independent basis for review because the act "`allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensated damages are sustained.'" Eastern Enters., 524 U.S. at 521, 118 S.Ct. 2131 (quoting Duke Power Co. v. Carolina Env't Study Group, Inc., 438 U.S. 59, 71 n. 15, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978)). That is exactly the situation here.
D. Summary on Justiciability and Ripeness
On June 23, 1999, the Court of Appeals, Division Two, declined discretionary review of the trial court's denial of Ecology's summary judgment motion to dismiss on justiciability/ripeness grounds. Its memorandum opinion succinctly summarized the appropriate disposition of this issue:
Ecology maintains that the case is not ripe because Asarco retains the right to proffer its constitutional challenge at the same time it challenges any investigative or remedial decision. While this may be true Ecology points to no case authority that requires, under the obvious error standard, Asarco to go through an entire proceeding before it can raise a constitutional challenge that, if successful, would preclude liability. Moreover Asarco presents authority supporting its position that a justiciable controversy exists. See First United Methodist Church v. Hearing Exam'r, 129 Wash.2d 238, 916 P.2d 374 (1996).
CP at 1698.
Under these facts, it is clear the State has finally determined Asarco shall be held liable for sums in excess of $78,000,000 for activities undertaken nearly a century ago, which, for the most part, were not even attributable to Asarco. A final CAP with respect to the Lowlands will not cure the constitutional objections but will merely detail the mechanics of the proposed retroactive remediation.

III.

Analysis on the Merits
The problem here is retroactivity as well as strict and disproportionate liability. Asarco must be adjudged by the same standard applicable to any other person, as should the *484 rights of any other person be measured by the standard applied to Asarco. Although our state constitution is not here at issue, its approach is persuasive: "A frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government." Wash. Const. art. I, § 32.
To begin, I agree with the trial court's conclusion that "application of MTCA to Asarco in this case may be a violation of substantive due process, an unconstitutional taking, or both." CP at 9 (Conclusion B); see also Eastern Enters., 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451. These challenges will therefore be considered in turn.
A. Takings
"The talisman of a taking is government action which forces some private persons alone to shoulder affirmative public burdens, `which, in all fairness and justice, should be borne by the public as a whole.'" Mission Springs, 134 Wash.2d at 964, 954 P.2d 250 (quoting Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)).
Asarco claims remediation of this site affords an affirmative public benefit, and should not prompt a burden which "in all fairness and justice" to be uniquely imposed on Asarco's shoulders. It argues fairness and justice are offended by unprecedented retroactivity, disproportionate liability, massive costs, and Asarco's inability, at the time of operation, to conform its conduct to meet unanticipated legal standards developed and imposed nearly a century later.
The world of takings is divided into two hemispheres: Those government acts which effect a taking if the action "does not substantially advance legitimate state interests" and those which "den[y] an owner economically viable use of his land." Agins, 447 U.S. at 260, 100 S.Ct. 2138. Asarco's claim conceptually relates to the first prong (legitimacy) not the second (denial of use). That is obviously the case since compensation is not at issue. Rather it is the claim of Asarco that application of the MTCA against it under these facts is not constitutionally permissible at all, even with compensation. This claim alleges a taking which is simply beyond the constitutional authority of government to effect in the first place.[7]
The United States Supreme Court has identified several factors worth considering with respect to a claim premised upon injustice and unfairness: "`[T]he economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action.'" Eastern Enters., 524 U.S. at 523-24, 118 S.Ct. 2131 (quoting Kaiser Aetna v. United States, 444 U.S. 164, 175, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)); Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 224-25, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 *485 (1986); Penn Cent. Transp. Co. v. New York, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).
The trial court analyzed these factors and factually found the economic impact of the regulation, over $78,000,000, was extreme; interference with reasonable investment backed expectations was aggravated since Asarco's operation at the time complied with all known and anticipated legal standards; and, finally, the character of the governmental action was offensive and illegitimate in the sense that it employed unprecedented retroactivity to impose strictly disproportionate liability.
The takings question before us is whether these problematic features defeat the "fairness and justice" required by Armstrong and its progeny, so as to render this an unconstitutional taking. Like the trial court, I would conclude by any traditional notion of justice, imposition of severely disproportionate and retroactive strict liability for events which occurred nearly a century ago, acts perfectly lawful at the time, deeply offends fundamental notions of fairness and justice.
Asarco's argument does not clearly differentiate between Fifth Amendment due process and takings clauses, but rather focuses upon features common to both, mainly the unfairness of retroactive legislation, its inability to anticipate liability or to conform its conduct to nonexistent standards, and disproportionate imposition of liability forcing Asarco to pay 100 percent of the cost to cure a problem for which it was at most 30 percent responsible. Asarco's approach is consistent with the result in Eastern Enterprises, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451.
Although a majority of the United States Supreme Court in Eastern Enterprises fractured on the question of whether retroactivity is properly analyzed under the taking or due process clause, at the end of the day five Justices viewed facts substantially less egregious to amply justify a holding of unconstitutionality.
Eastern Enterprises considered 30 to 50 years of retroactive liability imposed under the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. § 9701, resulting in $50,000,000 to $100,000,000 liability for health care costs of miners and their families. The plurality plus Justice Kennedy's concurrence (making a majority) marshaled substantial authority to support the all but self-evident proposition that retroactive application of a statute under most circumstances is patently unfair. See Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208, 109 S.Ct. 468, 469-70, 102 L.Ed.2d 493 (1988); Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 855, 110 S.Ct. 1570, 1586-87, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring); Dash v. Van Kleeck, 7 Johns. 477, 503 (N.Y.Sup.Ct.1811) ("It is a principle in the English, common law as ancient as the law itself, that a statute, even of its omnipotent parliament, is not to have a retrospective effect."); Herbert Broom, A Selection of Legal Maxims 24 (8th ed. 1911) ("Retrospective laws are, as a rule, a questionable policy, and contrary to the general principle that legislation by which the conduct of mankind is to be regulated ought to deal with future acts, and ought not to change the character of past transactions carried on upon the faith of the then existing law."); 2 Joseph Story, Commentaries on the Constitution of the United States § 1398, at 306 (5th ed. 1891) ("Retrospective laws are, indeed, generally unjust; and, as has been forcibly said, neither accord with sound legislation nor with the fundamental principles of the social compact."). See Eastern Enters., 524 U.S. at 524, 118 S.Ct. 2131 for additional authorities.
Indeed many provisions of the federal constitution evidence concern over retroactivity, for example the ex post facto clauses (art. I, § 9, cl. 3 and art. I, § 10), the impairment of contracts clause (art. I, § 10), prohibitions against bills of attainder (art. I, § 9 and art. I, § 10), and the due process clauses (Amend. V and Amend. XIV),[8] in addition to the takings clause (Amend. V). See Landgraf v. USI Film Prods., 511 U.S. 244, 266, 114 S.Ct. 1483, 1497-98, 128 L.Ed.2d 229 (1994); cf. W.R. Grace & Co. v. Dep't of Revenue, 137 Wash.2d 580, 613 n. 25, 973 P.2d 1011 (Sanders, *486 J., dissenting) (discussing the "antipathy to retroactive legislation" as manifested in several federal constitutional provisions), cert. denied, 528 U.S. 950, 120 S.Ct. 371, 145 L.Ed.2d 290 (1999).
Although retroactive legislation has been occasionally sustained when limited to a comparatively short period of time, even then it is often under circumstances where liability could be fairly anticipated based on other circumstances.[9] But that is not this case.
Disproportionate imposition of liability also offends fundamental fairness. Building on Nollan, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677, Dolan construed the takings clause to require governmental action which imposes a burden on a private landowner be roughly proportional to the problem created by the private landowner. But here, as the trial court found, the burden imposed on Asarco was more than three times greater than the problem caused by Asarco. In essence the MTCA operating through RCW 70.105D.040(2) (imposing strict liability, jointly and severally, upon each liable party for all remedial action costs) operated as no more than a search for deep private pockets to pay public costs of remediation without regard to prior notice, fault, or proportional relationship between causation and cost of remediation.
Nevertheless the concurrence and four dissenters in Eastern Enterprises were persuaded no taking had occurred because a specific property right or interest in a particular piece of property was not at stake. 524 U.S. at 541, 118 S.Ct. 2131 (Kennedy, J., concurring), 524 U.S. at 554, 118 S.Ct. 2131 (Stevens, J., dissenting). But even assuming for the sake of argument such a distinction is meritorious,[10] the imposition of liability in the case at bar is clearly related to remediation of a specifically identified piece of real *487 property and is premised upon prior ownership and use of a portion of that very property.
Although the plurality in Eastern Enterprises did not reach the substantive due process claim, it was the sole basis of Justice Kennedy's concurrence. While I conclude Asarco is correct that an unconstitutional taking has occurred under the facts of this case, it is likewise my view Asarco asserts even a stronger claim under the due process clause.
B. Due Process
Justice Anthony Kennedy preferred to rest his conclusion of unconstitutionality on the due process clause. The due process question is whether this statute, as applied, uses means that are not reasonably necessary to achieve its purpose or imposes a burden on the private party which is unduly oppressive. See Lawton v. Steele, 152 U.S. 133, 137, 14 S.Ct. 499, 38 L.Ed. 385 (1894); Goldblatt v. Town of Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). These questions are related as an oppressive result often indicates the means to achieve the end is unreasonable, i.e., use of public funds to solve a public problem is preferable. See Guimont v. Clarke, 121 Wash.2d 586, 610, 854 P.2d 1 (1993).
The trial court read Eastern Enterprises to focus the relevant due process inquiry on a number of factors including:
(1) The magnitude of the liability;
(2) The degree to which MTCA's application in the case is retroactive;
(3) The relationship between the liability imposed and Asarco's conduct;
(4) Whether Asarco could have altered its conduct in light of the liability; and
(5) The extent to which MTCA liability could reasonably have been anticipated.
CP at 11 (Conclusion J).
I can do no better than sketch the trial court's analysis on each of these points as I find myself in complete agreement, with one exception.
As to the magnitude of the loss, Asarco has already paid $11,000,000 and will be liable for at least an additional $78,000,000, and potentially much more. CP at 12 (Conclusion K). This compares directly to $50,000,000 to $100,000,000 of liability in Eastern Enterprises, 524 U.S. at 500, 538, 118 S.Ct. 2131 (plurality), id. at 549-50, 118 S.Ct. 2131 (Kennedy, J., concurring), which was there considered "substantial." Id. at 500, 118 S.Ct. 2131 (plurality).
The degree of retroactive liability imposed against Asarco here is virtually unprecedented. CP at 12 (Conclusion L). It reaches back over 80 years to when the company ceased operations and over 60 years to the sale of its last parcel of property. It is much more retroactive than the "extreme" and "unprecedented" 35 years of retroactive liability held unconstitutional in Eastern Enterprises. See 524 U.S. at 538, 118 S.Ct. 2131 (plurality); id. at 549-50, 118 S.Ct. 2131 (Kennedy, J., concurring).
Moreover Asarco's liability is grossly disproportionate to the share of the Everett clean-up costs fairly attributable to Asarco. CP at 12 (Conclusion M). While it contributed at most 30 percent of the arsenic at the site, it is now forced to pay 100 percent of the clean-up costs. CP at 12 (Conclusion M).
Finally, Asarco could not be expected to alter its conduct to conform to an unknown standard developed nearly a century later. CP at 12 (Conclusion N). This fact, especially viewed in light of the considerations set forth above, should lay to rest any doubt the MTCA was unconstitutionally applied to Asarco. The most important consideration to assess the constitutionality of retroactive legislation is "the extent to which the parties have laid reasonable reliance on the law existing at the time of the conduct whose legal consequences the retroactive statute would alter." Charles B. Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv. L. Rev. 692, 727 (1960).
Imposition of liability against Asarco under these circumstances is much more aggravated and extreme than that imposed on mobile home park owners in Guimont v. Clarke, 121 Wash.2d 586, 854 P.2d 1 or on owners of residential property in Robinson v. City of Seattle, 119 Wash.2d 34, 830 P.2d 318 (1992). In those cases we found a deprivation of *488 property without due process because, in each case, a private party was required to unfairly shoulder responsibility to cure a public or social problem.
In Guimont we made special note that the liability retroactively imposed on mobile home park owners could not have been anticipated. 121 Wash.2d at 612, 854 P.2d 1. In consequence they were afforded no opportunity to avoid the liability by altering the nature of their use before the statute came into effect. Id. The legal conclusion of the court was that the state had employed means in excess of those necessary to solve the problem and unduly oppressed the private property owner in consequence. Here, as in Guimont, the liability could not have been anticipated, and hence could not have been reasonably avoided by alteration, or even cessation, of operations.[11]
In Robinson we held the ordinance at issue suffered from like defects, including the inability of the owner to anticipate the liability and/or to alter his land uses to avoid payment into a residential housing replacement fund to obtain a demolition or change of use permit. 119 Wash.2d at 54-55, 830 P.2d 318.
These factors are even more pronounced in the case at bar. If remediation of this site is necessary or appropriate to serve the public interest, it is the public which, in fairness, must pay for it.
I have only one disagreement with the trial court: its conclusion that Ecology's requirement that Asarco pay the cost of cleaning up the 44 acres of on-site land survives the same constitutional infirmity applicable to the remainder of the site.
There are only two relevant factual distinctions in the analysis to separate the on-site from the off-site land: (1) Asarco owned the site at one point in time, and (2) the level of arsenic is higher at the smelter location than at the surrounding locations. These differences, however, do not dictate a different outcome to the same constitutional analysis. Significantly, the trial court did not find the arsenic contamination of the actual smelter site would yield any legal liability at the time the smelter was actually operated by Asarco. Absent that I cannot fathom the trial court's conclusion that Asarco could have anticipated liability. Retroactivity as to the entire parcel is identical, the inability to conform one's conduct to unanticipated requirements is the same, and the disproportionate imposition of liability is no different. Due process is therefore equally offended.

IV.

Conclusion
Doctrines of ripeness and judiciability are intended to promote the efficient disposition of claims. This purpose is defeated by requiring the parties to proceed through a needless adjudicatory procedure regarding the technicalities of a site clean-up plan, which is not, and cannot conceivably be, relevant to the discrete constitutional issues of retroactivity and proportionality raised in this appeal. Imposition of delay and expense on this private litigant effectively denies or substantially impairs its access to justice. Such a delay will cost tens, if not hundreds, of thousands of dollars plus exposing Asarco to draconian penalties. Justice delayed is justice denied.
The case was well briefed and appropriately presented. It deserves a decision on the merits which protects the constitutional rights of Asarco. I would affirm the trial court except as to the 44 acre smelter site, which I would reverse.
I therefore dissent.
BRIDGE, J. (concurring in dissent).
I agree in substantial part with the dissent, but write separately to clarify my differences with it. Thus, for the reasons articulated by Justice Sanders, I concur that Asarco's declaratory judgment action is both justiciable and ripe for review. Likewise, I *489 agree with Justice Sanders and the trial court that application of the Washington Model Toxics Control Act (MTCA), chapter 70.105D RCW, to Asarco in this instance may be in part a violation of substantive due process, but I disagree that a takings analysis is appropriate in this circumstance.
The United States Supreme Court's fractionated opinion in Eastern Enterprises v. Apfel, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), called into question the applicability of a takings analysis for an as applied challenge to a retroactive statute.[1] In Eastern, a plurality held that the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. § 9701, was unconstitutional in requiring a former coal operator to fund health benefits for retired miners. Id. at 504, 539, 118 S.Ct. 2131 (5-4 decision) (Kennedy, J., concurring). Four justices reached this conclusion under a takings rationale. Justice Kennedy agreed with the holding that the act, as applied, was unconstitutional, but concluded that takings did not provide the correct analytical framework. Instead he applied a substantive due process analysis. The four-justice minority agreed with the substantive due process analysis, but ultimately found the application of the statute constitutional.
Justice Kennedy refused, rightly I believe, to expand the application of the takings analysis noting, "in all of the cases where the regulatory taking analysis has been employed, a specific property right or interest has been at stake." Id. at 541, 118 S.Ct. 2131 (Kennedy, J., concurring). He and the four-justice dissent, authored by Justice Breyer, all agreed that as a general principle there is no property interest involved that would trigger a takings when a law merely requires someone to spend money. Id. at 539-48, 118 S.Ct. 2131 (Kennedy, J., concurring), 554-57, 118 S.Ct. 2131 (Breyer, J., dissenting). These five justices concluded that applying takings to a regulation that requires a party to pay money is contradictory to the traditional application of the takings clause to a specific interest in physical or intellectual property. Id. Furthermore, as Justice Kennedy reasoned: "[g]iven that the constitutionality of the Coal Act appears to turn on the legitimacy of Congress' judgment rather than on the availability of compensation... the more appropriate constitutional analysis arises under general due process principles rather than under the Takings Clause." Id. at 545, 118 S.Ct. 2131 (Kennedy, J., concurring).
Because this case involves the costs associated with an environmental remediation, I agree that it would be inappropriate to expand the takings analysis in this instance and conclude that due process considerations present a more suitable analytical framework. This approach would be consistent with five justices in Eastern and it is also supported by this court's case law. See Presbytery of Seattle v. King County, 114 Wash.2d 320, 330, 787 P.2d 907 (1990) (holding if regulation does not infringe upon fundamental attribute of ownership and it protects public from harm, court should analyze regulation for reasonableness under substantive due process, not takings).
I would affirm the trial court's conclusion that Ecology's requirement that Asarco pay the cost of clean-up in the 44-acre smelter site does not offend due process. The trial court's conclusion that Asarco could reasonably have anticipated liability for this section is sustainable. Supporting this determination, the trial court found that Asarco once owned the 44-acre parcel of land, that the levels of arsenic and lead were much higher here than on the off site soils due to the residues of byproducts and other dumping of contaminants, and that it would not be fundamentally unfair to hold the owner liable for the subsequent clean up of these contaminants.[2] Therefore, giving due regard to the criteria that the trial court considered in its *490 due process analysis,[3] I would hold that applying the MTCA to Asarco's smelter site is neither unreasonable to achieve the statutory purpose nor does it impose an unduly disproportionate burden on this private landowner with regard to the 44-acre parcel. I would also agree with the trial court and Justice Sanders that applying MTCA to the surrounding off site land would violate due process.[4]
NOTES
[1] Liability to clean the 7.2 acres purchased by Asarco is not at issue in this case.
[2] When a site is hazardous due to the presence of a carcinogen, the clean up goal is to reduce the risk of cancer to one in a million. WAC 173-340-700(3)(b). For arsenic, that level is roughly 1 ppm. However, that is lower than the natural background level of arsenic, and regulations do not set clean up lower than natural background levels. WAC 173-340-700(4)(d). Instead, Ecology seeks to reduce arsenic to the natural background level of 20 ppm. WAC 173-340-740(2) (tbl. 2). That is estimated in the regulations to correspond to a three in one hundred thousand cancer risk. WAC 173-340-740(3)(a)(iii)(B).

Lead is not believed to cause cancer. Ecology based its 353 ppm clean up standard for lead on the EPA's Integrated Exposure Uptake Biokinetic (IEUBK) model. The IEUBK model relates environmental exposure to lead (and consequent health risk) against blood levels of lead. Ecology is focusing on arsenic as reducing arsenic will also reduce lead levels.
[3] While many of its arguments appear to be facial challenges to the constitutionality of MTCA, Asarco has brought only an "as applied" challenge.
[4] We do not suggest individual plans could not be reviewed. However, we are unable to determine if the final plans would be integrated.
[5] The equal protection claim was subsequently dismissed without prejudice.
[6] The clean up plan for the uplands portion of the site is detailed, over 300 pages long. It outlines clean up standards for soil, groundwater, surface water, selection and implementation of remedies, institutional controls to prevent future problems and compliance monitoring, among other things. This Court was not provided comparative plans that have been approved or disapproved based on the Constitution, nor has it been provided specific argument why this plan is unsuitable. Asarco argued below the clean up standards were inconsistent with the EPA's clean up standards for Ruston, but otherwise, we have no argument about the fairness of the plan.
[7] The trial court concluded Asarco was responsible for causing 30 percent of the lead and arsenic pollution, and the Puget Sound Reduction Company was responsible for 70 percent.
[8] We do not address in this case whether the Legislature can constitutionally delay the consideration of fully ripe constitutional questions.
[9] CERCLA was challenged in several courts based on Eastern Enterprises, and survived every challenge. See, e.g., Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc., 240 F.3d 534, 552 (6th Cir.2001); United States v. Alcan Aluminum Corp., 49 F.Supp.2d 96 (N.D.N.Y.1999); Combined Props./Greenbriar Ltd. P'ship v. Morrow, 58 F.Supp.2d 675, 681 (E.D.Va.1999). Noted one commentator: "to date, CERCLA challenges based on Eastern Enterprises have not fared well .... the courts will most likely continue to apply the Eastern Enterprises decision very narrowly, and its effect on future challenges to CERCLA legislation will be minimal." Karen S. Danahy, CERCLA Retroactive Liability in the Aftermath of Eastern Enters. v. Apfel, 48 Buff. L. Rev. 509, 563-64 (2000) (collecting cases). The federal courts applying Eastern Enterprises in subsequent cases have overwhelmingly found it did not articulate binding principles of law. See, e.g., Ass'n of Bituminous Contractors v. Apfel, 156 F.3d 1246, 1254-55 (D.C.Cir.1998) ("Justice Kennedy's due process reasoning can in no sense be thought a logical subset of the pluralitys takings analysis."); Anker Energy Corp. v. Consol. Coal Co., 177 F.3d 161, 170 (3d Cir.1999), cert. denied, 528 U.S. 1003, 120 S.Ct. 496, 145 L.Ed.2d 383 (1999); Commonwealth Edison Co. v. United States, 46 Fed. CI. 29, 39 (2000) ("[N]o part of the plurality's reasoning constitutes binding precedent."); Morrow, 58 F.Supp.2d at 681 ("[N]o single theory of law was adopted by a majority of the Court, and Eastern Enterprises is not entitled to any precedential weight."); Franklin County, 240 F.3d at 552 ("We conclude that Eastern Enterprises has no precedential effect on this case because no single rationale was agreed upon by the Court."); Unity Real Estate Co. v. Hudson, 178 F.3d 649, 658 (3d Cir.1999) (finding that the "splintered decision" in Eastern Enterprises "makes it difficult to distill a guiding principle.").
[10] See also Guimont v. Clarke, 121 Wash.2d 586, 608-09, 854 P.2d 1 (1993).
[11] The trial judge entered a finding of fact that stated the "estimated cost for remediation of the Uplands portion of the Everett Site in accordance with the draft [clean up action plan] was approximately $78 million." Findings of Fact 54. Given our disposition of this case, we make no ruling regarding this figure. Asarco is free to contest or negotiate this issue in proper proceedings pursuant to chapter 70.105D RCW.
[1] Landgraf v. USI Film Prods., 511 U.S. 244, 265, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994).
[2] I cite to the trial court's findings (as opposed to statute or regulation) for ease of reference, consistency, and to indicate the trial court's understanding of the MTCA. All of the trial court's statements of the law are correct.
[3] After designating Asarco as a PLP, Ecology began to issue various enforcement orders to Asarco regarding the clean-up operation pursuant to its authority under RCW 70.105D.050. See, e.g., CP at 1261, 1299.
[4] The trial judge also found "for residential soils at the Everett Site, Ecology's Final Cleanup Action Plan specified a cleanup level of 20 ppm, the value listed in the regulations as the natural background value ... [which] corresponds to a 3 in 100,000 cancer risk." CP at 26 (Finding 60).
[5] It should be noted a person subject to statutory penalties has a direct interest in an action entitling it to test the constitutionality of the statute. Bare v. Gorton, 84 Wash.2d 380, 382, 526 P.2d 379 (1974); see also Navegar, Inc. v. United States, 103 F.3d 994, 998 (D.C.Cir. 1997) (holding threat of penalties may make case justiciable in a declaratory judgment action).
[6] MacDonald, Sommer & Frates was a use-restriction case and thus applied the Williamson County two-prong test. See 477 U.S. at 348-52, 106 S.Ct. 2561.
[7] The underlying rationale of this principle is where the governmental action attempts to impose an affirmative duty on unique private shoulders to foster a public benefit absent a legitimate exercise of the eminent domain power, the attempted taking is appropriately enjoined at the outset rather than allowed to proceed subject to compensation. See, e.g., Mo. Pac. Ry. Co. v. Nebraska, 164 U.S. 403, 416, 17 S.Ct. 130, 41 L.Ed. 489 (1896) (court invalidates uncompensated taking of property for lack of justifying public purpose); Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 836-37, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (unconstitutional taking of property results from illegitimate exaction); Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (disproportionate exaction is illegitimate taking); Manufactured Housing Cmtys. v. State, 142 Wash.2d 347, 374, 13 P.3d 183 (2000) (taking private property for private use unconstitutional under state constitution). Cf. Jan G. Laitos, Law of Property Rights Protection Limitations on Governmental Powers, "Takings: The Public Use Requirement," ch. 12, intro. at V-7 (Supp.2000) (Eastern Enterprises significant to the extent the plurality "concluded that the statute was an unconstitutional taking because it had imposed on a company the unanticipated obligation to make payments to retired employees," whereas "even the dissenting justices... conceded that retroactive laws may be so fundamentally unfair as to be unconstitutionally arbitrary. The Eastern Enterprises case may well mark the return of substantive antiretroactivity principles as a check on legislation."). To view just compensation as our alternative to injunctive relief in this case would seem to defeat the very purpose of the MTCA, which is to shift the burden of remediation away from the government to private shoulders; unlike Ruckelshaus v. Monsanto Co., 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), for example, no statute here allows for compensation.
[8] See Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 17, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976); R. R. Ret. Bd. v. Alton R. Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935).
[9] See, e.g., Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 731, 104 S.Ct. 2709, 2719, 81 L.Ed.2d 601 (1984).
[10] Justice Bridge's opinion similarly asserts without reasoned analysis that "there is no property interest involved that would trigger a takings when a law merely requires someone to spend money." Concurrence in dissent at 489. I disagree. If the private party is required to uniquely shoulder a public burden by incurring a liability to pay cash rather than transferring some item of property to the government in kind, the foundation principle (the "talisman" of a taking) is equally offended. In either case the value can be calculated in cash, the compensation about which the clause speaks, and in either case, the private party is equally required to uniquely shoulder a public burden. Whether in cash or kind, it doesn't matter. Nor can I see how imposing a legal duty or liability on private shoulders to spend money for public benefit is not a taking of private property if outright seizure of the cash under like circumstances would be. See Phillips v. Wash. Legal Found., 524 U.S. 156, 172, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998); Eastern Enters., 524 U.S. at 537, 118 S.Ct. 2131 (plurality); Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 160-63, 101 S.Ct. 446, 66 L.Ed.2d 358 (1980); Wash. Legal Found. v. Legal Found. of Wash., 271 F.3d 835, 852-53 (9th Cir.2001) (en banc); id. at 864-67 (Kozinski, J., dissenting); Schneider v. Cal. Dep't of Corrs., 151 F.3d 1194, 1201 (9th Cir.1998); Unity Real Estate Co. v. Hudson, 889 F.Supp. 818, 845 (W.D.Pa.1995); Siroky v. Richland County, 271 Mont. 67, 73, 894 P.2d 309 (1995); Laitos, supra, § 9.02[A]; see also Hinesburg Sand & Gravel Co. v. Chittenden Solid Waste Dist., 959 F.Supp. 652, 657 (D.Vt.1997) ("While most takings claims involve land interests, personal property including moneymay in some circumstances constitute a property interest for takings purposes." (emphasis added)); Town of Flower Mound v. Stafford Estates Ltd. P'ship, 71 S.W.3d 18 (Tex.Ct.App.2002) ("The Fifth Amendment of the United States Constitution ... prohibit[s] the taking of private propertyboth real and personal, and including moneyfor public use without just compensation." (emphasis added)). United States Court of Appeals for the Ninth Circuit Judge Alex Kozinski, although in dissent, explains it best: "[N]o case has ever held that there are some kinds of `private property for which no compensation is due.'" Wash. Legal Found., 271 F.3d at 864 (Kozinski, J., dissenting).

[M]oney is property and [there is] no logical explanation for treating it differently.... If the government comes into your house and takes your Renoir off your wall, you will suffer a compensable loss. You suffer the same loss if the government comes into your house and seizes an equal value in cashthe two events are indistinguishable for purposes of takings analysis....
For purposes of the takings clause, then, real and personal property are reduced to their cash equivalents. It thus strikes me as peculiar and quite dangerous to say that the government has greater latitude when it takes money than when it takes other kinds of property.
Id. at 866.
[11] This same consideration was reiterated in In re Estate of Burns, where this Court stated, "Courts disfavor retroactivity because of the unfairness of impairing a vested right or creating a new obligation with respect to past transactions. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." 131 Wash.2d 104, 110, 928 P.2d 1094 (1997) (citations omitted).
[1] When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "`the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds....'" Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).
[2] Clerk's Papers (CP) at 13.
[3] The trial court considered: (1) the magnitude of the liability; (2) the degree to which MTCA's application in this case is retroactive; (3) the relationship between the liability imposed and Asarco's conduct; (4) whether Asarco could have altered its conduct in light of the liability; and (5) the extent to which MTCA liability could reasonably have been anticipated. CP at 11.
[4] CP at 12.